R. C. MALONE and Nettie A. Malone,
Plaintiffs,

v.

UNITED STATES of America,
Defendant.

No. DC 6911–K.

United States District Court,
N. D. Mississippi,
Delta Division.

April 29, 1971.

Ben F. Mitchel, Cleveland, Miss., for plaintiffs.

Jack Warren, Justice Dept., Washington, D. C., for defendant.

## MEMORANDUM OPINION

KEADY, Chief Judge.

This action was instituted under 28 U.S.C. § 1346(a) (1) by R. C. Malone and Nettie A. Malone against the United States for recovery of $5,706.73 assessed against and collected from them as federal income taxes for the calendar year 1961, plus interest and costs.[1]

The case presents three questions: (1) whether plaintiff realized a long-term capital gain in 1961 as the result of

---

1. § 1346. *United States as defendant*

(a) The district courts shall have original jurisdiction, concurrent with the Court of Claims, of:

(1) Any civil action against the United States for the recovery of any internal-revenue tax alleged to have been erroneously or illegally assessed or collected, or any penalty claimed to have been collected without authority or any sum alleged to have been excessive or in any manner wrongfully collected under the internal-revenue laws.

(The parties agree that Mrs. Malone joins as a plaintiff only because she filed a joint tax return with Mr. Malone for 1961. Unless the context requires otherwise, R. C. Malone will be referred to as the plaintiff in this action.)

a transfer of 546 acres of encumbered farm land to a trust for the benefit of his grandchildren; (2) whether $33.70 paid by plaintiff for legal fees in connection with a mortgage placed on the land in question a few months before creation of the trust represented a non-deductible capital expenditure; (3) whether plaintiff realized ordinary income of $1,784.20 in 1961 as the result of cattle sales in that year. Following briefing by counsel and the submission of a comprehensive pre-trial order stipulating the legal and factual issues, the parties consented to submit the entire case to the court for final judgment upon the pleadings, pre-trial order, exhibits and the deposition of R. C. Malone, without an evidentiary hearing.

As revealed by the pre-trial order and by plaintiff's deposition, the factual background of the case as to questions (1) and (2) above is as follows:

On or about January 25, 1940, plaintiff purchased, for $13,650, 546 acres of farm land, known as the Willis Place, in Bolivar County, Mississippi. On or about February 6, 1956, he obtained a loan of $21,000 from the Federal Land Bank of New Orleans, executing his personal note and deed of trust[2] on the Willis Place as security. The loan was to be repaid in 21 annual installments, the first to be due and payable on November 15, 1956.

On or about July 28, 1961, after having reduced the initial mortgage debt to $16,000, plaintiff obtained a second loan from the Federal Land Bank, this time procuring an additional $16,000. The second loan was also evidenced by his personal note and secured by deed of trust on the same land; the two loans were consolidated for purposes of payment and were to be repaid in 35 annual installments commencing on January 15,

1962. Plaintiff paid $33.70 as legal fees to obtain the second loan, comprising a $3.70 recording fee and a $30 attorney's fee.

On October 31, 1961, plaintiff established an irrevocable trust, known as the "Malone Trust", for the benefit of his four minor grandchildren and any after-born grandchildren. On the same date he conveyed the Willis Place, subject to the two mortgages, to the trustees of the Malone Trust. The two trustees, who were plaintiff himself and The Cleveland State Bank of Cleveland, Mississippi, joined as grantees in the execution of the conveyance "to acknowledge and accept the property as trust property" and "to further acknowledge the acceptance and agreement of the terms and conditions expressed in * * * [the] Trust Agreement." The trust agreement itself provided that the Willis Place was "to be held by said Trustees in Trust, but subject to certain indebtedness [to the Federal Land Bank of New Orleans in the amount of $32,000] secured by the Trust Property." This agreement specifically directed the trustees to "hold the lands", and

"manage and invest the Trust Property and shall collect and receive the income thereof; and after *deducting* all necessary expenses incident to the administration of the Trust and the installments of principal and interest due annually on the loan [from the Federal Land Bank of New Orleans] and secured by the Trust Property, shall dispose of the principal and income of the Trust as follows * * * *" [Here follow discretionary directions to pay remaining income to the grandchildren during their minority and mandatory directions to terminate the trust as each grandchild becomes 21 years of age and pay to him his share

2. Under Mississippi law, which is applicable here in determining the nature and existence of legal rights and interests, Morgan v. Commissioner of Internal Revenue, 309 U.S. 78, 626, 60 S.Ct. 424, 84 L.Ed. 585 (1940), a deed of trust executed to secure a debt, although in form a conveyance, passes no title but creates only a lien or mortgage, general ownership remaining in the mortgagor. Carpenter v. Bowen, 42 Miss. 28, 49–50; Buck v. Payne & Raines, 52 Miss. 271, 279.

of the corpus and undistributed income.] (Emphasis added).

The evidence reflects that plaintiff did not use the proceeds of either loan to improve or operate the trust property, but to conduct his personal farm operations on other lands and purchase farm machinery for his own use. It is clear that both loans were for plaintiff's personal use unrelated to the establishment or operation of the trust.

Since the formation of the trust in 1961, the trustees have received annual rent of $7,500 upon lease of the trust property and have paid the annual loan installments therefrom. Plaintiff has not been called upon to make any loan payment. The trust has also accumulated an undisclosed sum of money after meeting the annual mortgage payments and other expenses and making certain distributions to the trust beneficiaries.

On June 12, 1962, plaintiffs filed a joint United States gift tax return, reporting the aforesaid conveyance to the Malone Trust and listing its gross market value as $57,485. They listed the net value of the gift as $25,485, after deducting the $32,000 lien thereon; and plaintiffs paid no gift tax by claiming applicable exclusions and exemptions.

Following an audit of plaintiffs' 1961 joint federal income tax return, the Commissioner of Internal Revenue, by a ninety-day letter, gave them statutory notice that: (1) they had realized a long-term capital gain of $18,616.30 in 1961 on account of the transfer to the Malone Trust of the 546 acres of debt-encumbered land; (2) the $33.70 legal fees incurred in procuring the second mortgage were non-deductible capital expenditures and not deductible business expenses;[3] and (3) they had realized $1,784.20 in ordinary income on 1961 cattle sales. Based on the Commissioner's determinations, Internal Revenue Service assessed additional taxes of $4,898.48, plus $808.-25 interest, totaling $5,706.73, which plaintiffs promptly paid. They timely filed a claim for refund, waived statutory notice of disallowance, and instituted the present action.

I.

Plaintiff contends that the conveyance to the trust was wholly a gift, which resulted in no pecuniary benefit to him, and he therefore realized no gain taxable as income. The government disagrees, arguing that by the trust agreement the trustees assumed the mortgage debt, relieving the plaintiff of primary liability thereon, and since the mortgage debt was greater than his basis, the transaction was part gift and part sale. Conceding that the plaintiff made a valid gift of $25,485, the value of the land in excess of the debt, the government claims plaintiff also made a sale, or other disposition, whereby he realized a long-term capital gain of $18,650, or the difference between the $32,000 debt and $13,-350, plaintiff's adjusted basis in the land.

■■ Plaintiff insists that his conveyance to the Malone Trust fulfilled all requirements of law to constitute a valid gift.[4] Yet, the government urges that

---

3. To clarify the computations, we note that plaintiff's basis in the Willis Place had been reduced from $13,650 at time of purchase to $13,350 when it was conveyed to the trust. If the government is correct in its contention that the $33.70 legal fees should be treated as capital expenditures, that amount would be added to plaintiff's basis, increasing it to $13,383.70. For purposes of continuity and clarity, however, we shall use the figure of $13,350 as plaintiff's basis hereafter, which will also cause the figure for claimed taxable gain to be increased from $18,616.30 to $18,650.

4. A valid inter vivos gift, under Mississippi law and generally, has the following elements: a competent donor who, freely intending to make a gift, delivers it absolutely and irrevocably to a donee capable of taking the gift, who accepts it. To consummate an effective gift, the transaction must be gratuitous and complete, with nothing left undone. McClellan v. McCauley, 158 Miss. 456, 130 So. 145 (1930); Allison v. Allison, 203 Miss. 20, 33 So.2d 619 (1948); Maier v. Hill, 221 Miss. 120, 72 So.2d 209 (1954). Noel v. Parrott, 15 F.2d 669 (1926). Mertens, Laws of Federal In-

the transaction was not wholly gratuitous since plaintiff received a valuable consideration in the form of relief from his primary liability on a $32,000 debt, and that the transaction was, therefore, a partial sale resulting in a substantial taxable gain to plaintiff. This directly raises the question of whether the trust estate merely accepted title subject to the mortgage or assumed responsibility for its payment. It is settled state law "that a mortgagor may convey the mortgaged premises subject to the mortgage [in which case the grantee incurs no liability], or he may convey them in such manner that the grantee assumes the payment of the mortgage debt, and thus renders himself personally and primarily liable therefor." [5]

■■■ The government argues that the language of the trust instrument, although not cast in terms of a formal assumption, was sufficient under applicable Mississippi law to create an assumption of the taxpayer's debt by the trust. This argument is well-taken, since under the general law no particular form of words is necessary to create a binding assumption, and it is sufficient that the language shows a clear intent on the part of a grantee to assume the liability for paying the mortgage debt.[6] The general rule above stated was first recognized by the Mississippi court in 1925, and has been followed consistently ever since.[7] As the court stated in *Gilliam*, quoting from 3 Pomeroy's Equity Jurisprudence, ¶ 1206:

"The mortgagor may not only convey the premises 'subject to' the mortgage; he may also convey them in such a manner that the grantee assumes the payment of the mortgage debt, and thus renders himself personally liable therefor. * * * No particular form of words is necessary

to create a binding assumption; it is sufficient that the language shows unequivocally an intent on the part of the grantee to assume the liability of paying the mortgage debt, but this intent must clearly appear. When the deed executed by the grantor contains a clause sufficiently showing such an intent, the acceptance thereof by the grantee consummates the assumption, and creates a personal liability on his part, which inures to the benefit of the mortgagee as though he had himself executed the deed."

Here, plaintiff not only conveyed the lands to the Malone Trust subject to the mortgage, but he also directed that the trustees "deduct" the annual debt installments from the trust income. It is important to note that plaintiff, as settlor, neither reserved any portion of the income from the Willis Place for his own use in paying the debt, nor did he covenant with the trust that he would protect it against paying the mortgage. Necessarily, the directions to the trustees that they deduct from the trust income an amount equal to the annual installments of the loan's principal and interest can mean only a mandate to pay the deducted amount to the mortgagee, thereby enabling the trustees to protect the lands against foreclosure and secure its income for the trust, which was their duty under the trust instrument. The trustees expressly accepted this paramount obligation, which had to be satisfied before they could make any distribution to a beneficiary or otherwise fulfill the purposes of the trust. Such provisions clearly establish an intent on the plaintiff's part for the trust estate to bear the payment of the mortgage and also an intent on the trustees' part to accept responsibility for such payment. Of course, the trustees did not bind

---

come Taxation, Vol. I, § 7.12, Chapter 7, p. 36.

5.  Hodges v. Southern Building & Loan Association, 166 Miss. 677, 148 So. 223 (1933).

6.  See 59 C.J.S. Mortgages § 406a, p. 571.

7.  Gilliam v. McLemore, 141 Miss. 253, 106 So. 99, 43 A.L.R. 79 (1925) ; Hays' Estate v. Commissioner of Internal Revenue, 181 F.2d 169 (5 Cir., Miss.1950) ; Edwards v. Greenwald, 217 F.2d 632 (5 Cir., Ga.1954).

themselves individually, but they unequivocally committed the trust to use its income to pay the mortgage. It is also clear from the evidence that the trustees understood their obligations as to payment of the mortgage debt, since each subsequent installment to date has been paid direct to the mortgagee, Federal Land Bank of New Orleans, by a check drawn on the trust account.

As the Fifth Circuit, applying Mississippi law in *Hays' Estate,* supra, an estate tax case, has said:

> "It is elementary that the grantee in an instrument who accepts such a trust is bound by its obligations, and that *the form of the assumption is immaterial provided it casts upon the grantee the burden to pay the indebtedness.*" (Emphasis added).[8]

In *Hays' Estate,* the settlor conveyed certain farm lands, subject to outstanding mortgages, to the trust estate and, according to the Court's opinion, it authorized and directed the trustee to pay the lien indebtedness out of income derived from the property. The Court of Appeals held that this was sufficient to constitute an assumption of the debt and reversed the Tax Court's holding that under Mississippi law the trust agreement did not indicate that the trustee was to assume the mortgage debt. Plaintiff's counsel agreed that the *Hays* trust provisions, construed by the Fifth Circuit as a direction to pay the debt, are substantially identical to the Malone provisions.

We hold that when the Malone trustees received the conveyance and trust instrument and accepted their duties thereunder, the trust estate assumed the debt and became primarily liable for

its payment; and plaintiff was thereafter only secondarily liable as a surety.[9] Granting that the assumption of debt did not constitute either a cancellation or total discharge of plaintiff's debt liability, the chances that he would ever have to pay any portion of the debt were remote indeed. For even though the mortgagee under Mississippi law still had the option to proceed against either plaintiff or the trust estate if the mortgage installments were not paid,[10] plaintiff, as a surety, would be subrogated to the rights of the mortgagee if he were compelled to pay the mortgage, and could thereafter go against both the income and the corpus of the trust estate to recoup any amounts he might have paid to the mortgagee.[11]

Nor may we ignore the realities of the situation, i. e.: the debt installments amounted to only $\frac{1}{7}$ of the annual trust income; the entire debt, $32,000, was considerably less than the admitted fair market value of the trust property, $57,485; plaintiff himself was one of the two trustees and in that capacity has made the annual debt payments regularly from 1961 to the present, the trust having excess income to bank thereafter; there is no evidence that the mortgagee has indicated an intention to demand payment by plaintiff personally. Thus it is apparent that the assumption of the plaintiff's debt by the trust estate resulted in a pecuniary benefit to him. This benefit was clearly a consideration extended by the trust to plaintiff for his "gift" of the Willis Place, and the transaction may not be considered a pure gift.

Having determined that the transfer to the trust resulted in pecuniary bene-

---

8. We note that although the part of *Hays* decision concerning reservation of income for estate tax purposes has been overruled, Lober v. United States, 108 F. Supp. 731, 124 Ct.Cl. 44 (Ct.Cl.1952), aff'd 346 U.S. 335, 74 S.Ct. 98, 98 L.Ed. 15 (1952), the part of that decision on which we here rely is still good law. Barber v. United States, 251 F.2d 436 (5 Cir. 1958).

9. Edwards v. Greenwald, supra; Hays' Estate, supra; Gilliam v. McLemore, supra.

10. Smith v. General Investments, Inc., 246 Miss. 765, 150 So.2d 862 (1963); North American Life Ins. Co. v. Smith, 178 Miss. 238, 172 So. 135 (1937).

11. McLeod v. Building & Loan Ass'n of Jackson, 168 Miss. 457, 151 So. 151 (1933). Miss.Code Ann. § 253 et seq.; 59 C.J.S. Mortgages § 416, pp. 603–608.

fit to plaintiff, we next consider whether that benefit constituted a taxable gain, and if so, in what amount.

■ "Gain", for purposes of federal income taxation, is not limited to receipt of cash or tangible property.

"While economic gain is not always taxable as income, realization of gain need not be in cash derived from sale of asset, and 'gain' may occur as the result of exchange of property, payment of a taxpayer's indebtedness, relief from a liability, or other profit realized from completion of a transaction." Helvering v. Bruun, 60 S.Ct. 631, 309 U.S. 461, 84 L.Ed. 864 at 869 (1940).

The cancellation, discharge or assumption of a debt has long been considered a taxable gain to the debtor where the debtor gives no consideration for the cancellation. A common type of transaction in which such gain by cancellation of debt occurs is the establishment of a trust with income in a low tax bracket by a settlor in a high tax bracket with directions that the trust pay his debts.[12]

■ It is clear from the noted cases that the benefit derived by plaintiff from his disposition of the Willis Place constitutes a taxable gain, which must be accorded capital gains treatment under 26 U.S.C. § 1231 since the Willis Place was a capital asset of taxpayer which he had held for more than six months.

The government relies on several statutes and administrative regulations to support its contention that the amount of the gain is the amount by which the assumed debt exceeds plaintiff's adjusted basis. § 1001(a) of the 1954 Internal Revenue Code provides that the gain from the sale or other disposition of property shall be the excess of the amount realized therefrom over the adjusted basis provided in § 1011 for determining gain. § 1001(b) of the Code explains that the amount realized from the sale or other disposition of property shall be the sum of any money received plus the fair market value of the property (other than money) received.[13] Treasury regulations also provide that where a transfer of property is in part a sale and in part a gift, the transferor has a gain to the extent that

12. Douglas v. Willcuts, 296 U.S. 1, 56 S.Ct. 59, 80 L.Ed. 3 (1935); Darling v. United States, 375 F.2d 843, 179 Ct.Cl. 891 (1967); see annotations at 101 A.L.R. 397, 109 A.L.R. 1048, 132 A.L.R. 819 and 158 A.L.R. 1315. We note that for federal income tax purposes, gain in the form of debt assumption is considered "money" received. Estate of Lipman v. United States, 376 F.2d 455 (6 Cir. 1967); Smith v. Commissioner of Internal Revenue, 324 F.2d 725 (9 Cir. 1963).

13. The applicable Internal Revenue Statutes are:

§ 1001. Determination of amount of and recognition of gain or loss.

(a) Computation of gain or loss.—The gain from the sale or other disposition of property shall be the excess of the amount realized therefrom over the adjusted basis provided in § 1011 for determining gain.

\* \* \* \* \*

(b) Amount realized.—The amount realized from the sale or other disposition of property shall be the sum of any money received plus the fair market value of the property (other than money) received.

\* \* \* \* \*

(c) Recognition of gain or loss.—In the case of a sale or exchange of property, the extent to which the gain or loss determined under this section shall be recognized for purposes of this subtitle shall be determined under section 1002.

§ 1002. Recognition of gain or loss.

Except as otherwise provided in this subtitle, on the sale or exchange of property the entire amount of the gain or loss, determined under section 1001, shall be recognized.

§ 1011. Adjusted basis for determining gain or loss.

(a) General Rule.—The adjusted basis for determining the gain or loss from the sale or other disposition of property, whenever acquired, shall be the basis (determined under section 1012 or other applicable sections of this subchapter \* \* \*), adjusted as provided in section 1016.

\* \* \* \* \*

§ 1012. Basis of property—cost.

The basis of property shall be the cost of such property.

the amount realized by him exceeds his adjusted basis in the property.[14]

Having concluded that there was an effective assumption, we need not consider the government's contention that taxable gain is always realized when a taxpayer disposes of property mortgaged in excess of the taxpayer's adjusted basis, even if he was not personally liable on the mortgage debt.[15] While it is doubtful that the noted cases establish the proposition which the government contends they do, we need not reach those broad questions in the case sub judice, where the taxpayer: (a) was personally liable on the mortgage debt before disposing of the property; (b) used the loan proceeds for his own purposes; and (c) then placed primary liability for repayment of the debt upon the trust income.[16]

Because plaintiff expended the mortgage funds for his own benefit and not on the trust property, we find the Fifth Circuit decision of Edwards v. Greenwald, supra, similarly inapposite. In *Greenwald* a brother and sister purchased interests in certain retail businesses, giving their notes and mortgages on the business property to secure their purchase price obligations. They then conveyed the property, subject to the encumbrances, to separate trusts for the benefit of their children and grandchildren, directing the trustees to pay the mortgage debts out of the trust income. Under applicable Georgia law the trusts then became primarily liable for the debts, and the settlors became mere sureties on the notes, liable only if the trustees failed to pay and a foreclosure sale of the property failed to satisfy the debts. The Fifth Circuit held that since the debts were incurred contemporaneously with the creation of the trusts and for the sole purpose of acquiring property to place in the trusts, and not for any personal benefit to the taxpayers-settlors, the transaction was a pure gift, not subject to federal income taxation. Since taxpayer here used the proceeds of the loan for his own purposes, and not for the benefit of the trust, *Greenwald* is clearly inapplicable here.[17]

Plaintiff argues that if his transfer to the trust is a disposition taxable to him, there will result double taxation on the gain upon the trustees' later disposition of the property, by asserting that the trust basis at that time will be $13,350, the same as plaintiff's basis under the provisions of 26 U.S.C. § 1015(a).[18] We find no merit in this contention since that statute is applicable only in the case of a pure gift, which is not the situation here. Instead, the provisions of 26 U.S.C. § 1015(b)[19]

14. 26 C.F.R § 1.1001–1 *Computation of gain or loss.*
(e) *Transfers in part a sale and in part a gift.*
(1) Where a transfer of property is part a sale and in part a gift, the transferor has a gain to the extent that the amount realized by him exceeds his adjusted basis in the property.

15. Crane v. Commissioner of Internal Revenue, 331 U.S. 1, 67 S.Ct. 1047, 91 L.Ed. 1301 (1947); Parker v. Delaney, 186 F.2d 455 (1 Cir. 1950); O'Dell & Sons Co., Inc. v. Commissioner of Internal Revenue, 169 F.2d 247 (3 Cir. 1948); and Stamler v. Commissioner of Internal Revenue, 145 F.2d 37 (3 Cir. 1944).

16. Nor need we reach the government's alternate contention that in the absence of an assumption the plaintiff would realize ordinary income to the extent that the trust made payments on the mortgage debt. See Old Colony Trust Co. v. Commissioner of Internal Revenue, 279 U.S. 716, 49 S.Ct. 499, 73 L.Ed. 918 (1928).

17. See also Commissioner of Internal Revenue v. Turner, 410 F.2d 752, 753 (6 Cir. 1969), and Herff v. Rountree, 140 F. Supp. 201 (M.D.Tenn.1956), appeal dismissed 249 F.2d 958 (6 Cir. 1957).

18. (a) *Gifts after December 31, 1920.*—If the property was acquired by gift after December 31, 1920, the basis shall be the same as it would be in the hands of the donor.

19. (b) *Transfers in trust after December 31, 1920.*—If the property was acquired after December 31, 1920, by a transfer in trust (other than by a gift, bequest, or devise), the basis shall be the same as it would be in the hands of the grantor increased in the amount of gain or de-

would control, making the basis of trust property acquired by transfer other than by gift the transferor's basis increased by the amount of gain recognized to the transferor in the year of the transfer. Thus, the basis of the Malone Trust in the Willis Place would be the transferor's basis, $13,350, increased by the amount of gain recognized to plaintiff on the transfer to the trust, $18,650, or a total basis in the trust property of $32,000.[20] Plaintiff's fears of double taxation are, therefore, unfounded in light of the donee's increased basis.

The government's position here is not contradictory to the position it took in Woodsam Associates Inc. v. Commissioner of Internal Revenue, 198 F.2d 357 (2 Cir. 1952), as plaintiff contends, because the property disposition in that case was pursuant to a tax-free exchange under a special statute, and not a partial sale, as here.

## II.

■ Having found that there is no substantial evidence to support the government's theory that plaintiff obtained the 1961 loan and created the trust in a single, unified transaction,[21] we must reject the government's contention that the $33.70 legal fees paid by plaintiff in obtaining the 1961 loan should be added to plaintiff's basis in the Willis Place as a capital expenditure[22] incurred in disposing of the property to the trust. Since the incurring of the legal fees was an ordinary business expense that plaintiff was entitled to deduct from taxable income, the Commissioner erred in disallowing its deduction.

## III.

In his income tax return for 1961 plaintiff reported capital gains of $1,834.20 from the "sale of stock from breeding herd". Of that amount, the Commissioner disallowed $1,784.20 which he determined to be ordinary income as proceeds from four sales to customers made in the usual course of business.[23] This poses the applicability of 26 U.S.C. § 1231(a), (b) (3).[24]

---

creased in the amount of loss recognized to the grantor on such transfer under the law applicable to the year in which the transfer was made.

20. 26 U.S.C. § 1015(d) ; see also Treas. Regs. § 1.1015–4.

21. Cf. Simon v. Commissioner of Internal Revenue, 285 F.2d 422 (3 Cir. 1960).

22. See Treas.Regs. § 1.263(a)–2(e) ; Helvering v. Winmill, 305 U.S. 79, 59 S.Ct. 45, 83 L.Ed. 52 (1938) ; Spreckels v. Commissioner of Internal Revenue, 315 U.S. 626, 62 S.Ct. 777, 86 L.Ed. 1073 (1942).

23. These sales involved 17 head of cattle described as follows :

| Date of Sale | No. Head Sold | Age of Oldest Head Sold | Sales Price |
|---|---|---|---|
| 2–23–61 | 8 | 16 months | $ 384.20 |
| 3–25–61 | 6 | 4 months | 300.00 |
| 6–20–61 | 1 | 32 months | 375.00 |
| 12–30–61 | 2 | 24 months | 725.00 |
| | | | $1,784.20 |

24. § 1231. *Property used in the Trade or business and involuntary conversions.*

(a) *General rule.*—If, during the taxable year, the recognized gains on sales or exchanges of property used in the trade or business, plus the recognized gains from the compulsory or involuntary conversion (as a result of destruction in whole or in part, theft or seizure, or an exercise of the power of requisition or condemnation or the threat or imminence thereof) of property used in the trade or business and capital assets held for more than 6 months into other property or money, exceed the recognized losses from such sales, exchanges, and conversions, such gains and losses shall be considered as gains and losses from sales or exchanges of capital assets held for more than 6 months. If such gains do not exceed such losses, such gains and losses shall not be considered as gains and losses from sales or exchanges of capital assets. * * *

\* \* \* \* \*

(b) *Definition of property used in the trade or business.*—For purposes of this section—

\* \* \* \* \*

The evidence on this issue rests altogether upon plaintiff's deposition testimony. Plaintiff entered the cattle business in 1940 when he acquired six registered Aberdeen Angus heifers and a one-half interest in a registered bull of the same breed, and until the year in issue he has bred, raised and sold only pure-bred Angus cattle. He has had at all times more than ample pasture for a herd never exceeding 150 head. About half of the offsprings were bull calves, almost all of which he regularly disposed of, retaining not more than two or three for his breeding herd. As a rule plaintiff was opposed to in-breeding. The herd was periodically culled, and the heifer calves which "did not look right" and the bull calves which were castrated were taken out and sold through the stockyards for slaughter. The remaining calves were registered by plaintiff. When a calf was registered, plaintiff regarded it as "a potential member of the breeding herd—I would expect to keep the calf if it turned out all right, but if it did not turn out all right I would sell it to the stockyard." Animals thus eliminated were never sold to other breeders.

Plaintiff testified that he advertised in different farm publications that he had Angus cattle for sale, emphasizing the bloodline and not any specific animals, but claimed that all of his herd as advertised was held for breeding purposes. Plaintiff testified, however, that all animals in the herd were for sale and would be shown to prospective buyers, stating: "All of them are for sale if the man wants to pay enough for them. Any of them are for sale if somebody wants to pay the price." Plaintiff regularly sold his cattle through auction rings, the heifers bringing as much as $600 and bulls $700 to $800; a calf crop was sold each year.

The evidence shows that plaintiff maintained his cattle as one herd, keeping them in the same pasture, and that he made no distinction between animals held for sale and those held for breeding insofar as their feeding, care and handling were concerned. At plaintiff's farm, heifers are bred at 18 months and a cow with calf brings a better price because she is a proved breeder.

In his deposition plaintiff stated that his "prime purpose", when first entering the cattle business and still is, was to "raise cattle for sale as breeding cattle," and not for commercial slaughter.

It is familiar law that whether an animal was held for breeding purposes, and not primarily for sale, so as to make the proceeds of sale of such animal taxable as a capital gain, is a question of fact, McDonald v. Commissioner of Internal Revenue, 214 F.2d 341 (2 Cir. 1954); Biltmore v. United States, 228 F.2d 9 (4 Cir. 1955); and the burden rests upon the taxpayer to prove by a preponderance of the evidence that the animal was held for breeding purposes, Moore v. United States, 246 F.Supp. 19 (N.D.Miss.1965). To be accorded capital gains treatment the animal must be held by the taxpayer for breeding purposes *within his own herd* and primarily not for sale in the ordinary course of business to customers for use in their herds. Fox v. Commissioner of Internal Revenue, 198 F.2d 719 (4 Cir. 1952); Vaughan v. Commissioner of Internal Revenue, 333 F.2d 714 (9 Cir. 1964).

When measured by the foregoing rules, plaintiff's evidence falls far short of the mark. His unequivocal declaration that his entire herd is held for sale and that his paramount object in the cattle business is to raise purebred cattle for sale as breeders negates any

(3) *Livestock.*—Such term includes—
 (A) cattle and horses, regardless of age, held by the taxpayer for draft, breeding, dairy, or sporting purposes, and held by him for 24 months or more from the date of acquisition, and

 (B) other livestock, regardless of age, held by the taxpayer for draft, breeding, dairy, or sporting purposes, and held by him for 12 months or more from the date of acquisition.
 Such term does not include poultry.

intention to hold the animals in issue for breeding purposes and establishes the fact that they were held primarily for sale. Thus, the Commissioner's determination that the sales in issue should not be accorded capital gains treatment was in accordance with law.

This Memorandum Opinion shall constitute the court's findings of fact and conclusions of law as required by Rule 52 of F.R.Civ.P.

Counsel for plaintiff and defendant are directed to submit order to the court for entry in accordance with the foregoing holdings.