**Burton F. GOLDBERG, Plaintiff,**

v.

**Joseph D. LOWE, Defendant.**

**No. WC 79–117–K–O.**

United States District Court,
N. D. Mississippi, W. D.

March 3, 1981.

S. Allan Alexander, Grady F. Tollison, Jr., Oxford, Miss., Erwin C. Ward, Jackson, Miss., for plaintiff.

T. H. Freeland, III, Oxford, Miss., for defendant.

## MEMORANDUM OPINION

KEADY, Chief Judge.

In this Mississippi-based diversity action, Burton F. Goldberg of Miami, Florida, sued James D. Lowe, a resident of Oxford, Mississippi, for specific performance of a real estate contract or, in the alternative, for substantial damages. Dallas Jones, a real estate broker with offices at Jackson, Mississippi, and Chicago Title Insurance Company, an Illinois corporation, were joined in the complaint as formal parties. Jones once held $10,000 in escrow to bind the agreement, and later returned the funds to Goldberg. Chicago Title Insurance Company was designated by Goldberg as escrow agent to handle the closing. Lowe counterclaimed for $10,000 as liquidated damages for alleged breach of the real estate contract and also for punitive damages. Lowe's cross-claim against Jones was dismissed without prejudice; Goldberg sought no relief against Jones or Chicago Title Insurance Company, and they were dismissed with prejudice.

After extensive discovery and a pretrial conference before the United States Magistrate, a three-day trial on the merits of the case was conducted in the district court. Following submission by the parties of proposed findings of fact and legal memoranda, the case is now ripe for final disposition. The court incorporates in this memorandum Rule 52(a) requirements for findings of fact and conclusions of law.

### I.

Lowe was the owner of an apartment property at Oxford, Mississippi, known as Crestview Apartments, consisting of 40 units. He was also a one-third owner of another Oxford apartment complex known as Country Club Terrace Apartments (Country Club) consisting of 96 units, and held a purchase option on a third Oxford apartment property of 48 units known as Lafayette Courts (Lafayette). Lowe was himself a licensed real estate broker and had traded in motels, farms and other properties for a number of years. In late 1978 or 1979 he contacted Jones, a resident of Brandon, Mississippi, who specialized in finding buyers and sellers for apartment properties. During several conversations, Lowe and Jones discussed the possibility of offering Crestview, Country Club and Lafayette, including fixtures and designated personal property, as a package to a single buyer. Lowe's asking price on Crestview was $600,000, while the asking price on Country Club, in which Lowe held a one-third interest with John Leslie, a local pharmacist, and Russell Blair, an Oxford attorney, was considerably higher.[1]

On or about March 29, 1979, Jones, as agent for Lowe and his associates, submitted the three apartment complexes to several potential prospects. As regards Crestview, Jones had previously obtained from Lowe income and expense data statements from which he prepared an appraised value of $600,000, and Lowe authorized him to seek a buyer at this price. Concurrently Jones was authorized by Country Club owners to seek a purchaser for Country Club for $1,450,000. In presenting these properties to potential buyers, Jones contacted Goldberg, with whom he had previous transactions on properties situated in Jackson, Mississippi. A person of large net worth, Goldberg had extensive experience in real estate holdings and owned one hotel in Florida, 900 apartment units and other properties in Mississippi and elsewhere. Goldberg indicated interest in acquiring both Crestview and Country Club; he submitted to Jones firm offers to purchase on terms Crestview for $525,000 and Country Club for $1,275,000. Jones, as agent for the sellers, prepared separate sales agreements on each prop-

---

1. It seems that no firm price was ever placed on Lafayette Courts; at least no buyer was ever found to purchase this property, and Lowe's option to purchase it expired.

erty. The Country Club transaction went through with Goldberg acquiring title and no present controversy stems from that sale; nevertheless since both sales agreements were prepared by Jones on the same date and on practically identical printed forms, with Goldberg as the purchaser designated in each transaction, the court finds it relevant to consider both agreements as well as subsequent actions of the parties relating to the performance of the Country Club sale and the nonperformance of the Crestview agreement.

EXECUTION OF WRITTEN CONTRACTS ON CRESTVIEW AND COUNTRY CLUB—SUPPLEMENTAL UNDERSTANDINGS

As for Crestview, Goldberg submitted a purchase offer by which a cash payment of $45,000 was to be made at time of closing, and the balance of the purchase price, i. e., $480,000, was to be paid by Goldberg

"executing a 3rd mortgage to Seller [Lowe] in the amount of One hundred sixty thousand and no/100 Dollars ($160,-000.00) at 9% payable at Eight hundred and no/100 Dollars ($800.00) per month for the first fifteen (15) months, interest only, and *assuming an outstanding 1st and 2nd mortgage in the total amount of Three hundred twenty thousand and no/100 Dollars ($320,000.00)* plus or minus One hundred and no/100 Dollars ($100.00). [The first mortgage against Crestview in the principal sum of $278,-241.68 was held by Bankers Trust Savings & Loan Association and the second mortgage in the principal sum of $38,941.84 was held by the Bank of Oxford.] The 3rd mortgage payment [to Lowe] will escalate to One thousand two hundred and no/100 Dollars ($1,200.00) per month at the end of the fifteenth (15) month from date of closing, interest only, and continue as such for sixty nine (69) additional months at which time the entire balance shall become due and payable. *The property shall be the sole collateral for said notes.*" (Emphasis added).

On the same date, i. e., April 14, 1979, Jones prepared a purchase agreement signed by Goldberg to purchase Country Club from Lowe, Leslie and Blair for $1,275,000, whereby Goldberg as purchaser would

"pay $125,000.00 (One hundred twenty five thousand and no/100 Dollars) in cash at closing and execute a 3rd mortgage of $385,600.00 in favor of [sellers] for a payment term of 35 years at 9% with a balloon payment in 7 years of the loan balance at that time, the first payment to be due and payable on September 1, 1979. *The property will be the sole collateral for said note. PURCHASER to assume the present loans of $669,500.00 ( + or –) (Six hundred nine thousand five hundred and no/100 Dollars)* [owing to Northwestern Mutual Life Insurance Company] and $94,900.00 ( + or –) (Ninety four thousand nine hundred and no/100 Dollars) [owing to Bank of Oxford]." (Emphasis added).

The Country Club contract was executed by Lowe, Leslie and Blair on the same day it was delivered to them by Jones; its terms were not modified in any respect.

The execution of the Crestview agreement, however, was delayed several days because of changes demanded by Lowe in the amount of cash to be paid and the amount to be carried in the third mortgage. On April 23 the revised contract, as signed by Goldberg, was delivered to Lowe at a Grenada restaurant by John Mills, an employee of Jones. Lowe objected to receiving less than $45,000 cash and carrying more than $160,000 on a third mortgage. Lowe also objected to paying the cost of title insurance. Mills telephoned Jones as to the changes which Lowe desired, and Jones authorized Lowe to make the three changes for resubmittal to Goldberg. On April 27, Goldberg examined the revised proposal and indicated his final acceptance by initialing the change in ¶ 6 headed "Evidence of Title" and in the unnumbered paragraph headed "Conditions" agreeing to the payment of $45,000 in cash at time of closing and making the third mortgage in favor of Lowe for $160,000.

An issue of fact arose as to whether the paragraph in the Crestview contract reading "The property shall be the sole collateral for said notes" was included in the document at the time Lowe signed the contract. Lowe asserts that this paragraph was not in the contract when he signed it, that its insertion was not authorized by him and that it was necessarily altered by someone after he had signed the agreement. Lowe was not given a copy of the agreement as finally accepted until several months later and his bare recollection of its contents is not persuasive. Jones, Mills and Goldberg all denied that the questioned paragraph was added at a later date. Indeed, the court finds from substantial evidence that the paragraph challenged by Lowe, "the property shall be the sole collateral for said notes," was included in the Crestview contract just as it had been a term in the unquestioned Country Club contract which Lowe, Leslie and Blair had signed at Oxford on April 14, 1979.

Both contracts provided that closing would take place within 60 days from acceptance. Goldberg advised Lowe that he inspected the property and found it to be in proper condition. However, it is clear that 60 days to close the Crestview transaction would run from the date of Goldberg's final acceptance of the contract on April 27, rather than the earlier inspection date, thus making June 26 the date for closing of the Crestview sale.

Both contracts provided that time was of the essence and upon failure of the purchaser to "complete the purchase as herein pro-vided, seller may, subject to any rights of the agent herein, retain all amounts paid hereunder as damages for the breach of the agreement by purchaser." (¶ 13). Each contract also provided "both parties shall deposit with an authorized escrow holder, selected by undersigned purchaser, all funds and instruments necessary to complete the sale in accordance with the terms hereof." (¶ 7). Jones advised the seller in both cases that Goldberg selected Chicago Title Insurance Company to act as the escrow agent and that it would make title search and prepare "closing papers" at his expense. It was left unclear whether the sellers were to have deeds drawn and placed with Chicago Title.

At the time of the execution of both contracts, it was known to all parties that first mortgages against Crestview and Country Club contained "due on sale" clauses, i. e., that the first mortgage indebtedness would become immediately due and payable unless the transfer was consented to in writing by the first mortgagee.[2] Moreover, the second mortgages held by the Bank of Oxford against Crestview and Country Club contained similar provisions.[3] Lowe, as well as the owners of Country Club, was, of course, concerned that the transfers to Goldberg would be acceptable to the mortgage holders. Goldberg, through Jones, agreed to obtain such consents to transfer without cost to Lowe as seller of Crestview and without cost to Lowe, Blair and Leslie as sellers of Country Club. In these negotiations it is important to note that Goldberg at no time had face-

---

2. ¶ 11 in Bankers Trust deed of trust on Crestview provided:

    Notwithstanding anything to the contrary contained herein, the Beneficiary may, at its option, upon the conveyance of the property by the Grantor to anyone else without first obtaining the written consent of the Beneficiary, declare all of the sums secured by this Deed of Trust to be immediately due and payable without further demand, and may invoke the power of sale and any other remedies permitted by applicable law.

Although not in the record, the undisputed fact is that Northwestern Mutual Life Insurance Company had a similar clause in its first mortgage against Country Club.

3. ¶ 8 of those instruments provided:

    "If all or any part of the Property is sold or transferred by Debtor ... [bank] may declare all the indebtedness to be immediately due and payable. [Bank] shall be deemed to have waived such option to accelerate if, prior or subsequent to the sale or transfer, [bank] and Debtor's successor in interest reach agreement in writing that the credit of such successor in interest is satisfactory to secured party and that the successor in interest will assume the indebtedness so as to become personally liable therefor ...."

to-face negotiations or personal conferences with the sellers of either property, but he always relayed his proposals and agreements through Jones as well as certain personnel who were in Goldberg's regular employ.

Chicago Title Insurance Company proceeded with title searches and timely received from Goldberg cash payments, which, together with money held in escrow by Jones, equalled the downpayments required for closing of both sales agreements.

During this time interval, Dallas Jones broached the idea of a "wrap around" mortgage, first to the owners of Country Club and then to Lowe individually. Jones suggested that a wrap-around might inure to the tax benefit of Lowe, Blair and Leslie in the sale of Country Club. In a wrap-around encumbrance, the sellers remain personally liable to senior encumbrancers and continue to make regular payments of principal and interest as though a sale or transfer of the encumbered property had not been made.[4] After checking with Country Club's tax accountants, Blair determined there was no advantage to Country Club in a wrap around mortgage, and Lowe reached the same conclusion with respect to Crestview. Despite these conclusions, Jones, apparently acting with the approval if not the direction of Goldberg, caused promissory notes equal to the amount of the third mortgage on both properties and a wrap around deed of trust obligating the sellers to continue to pay out of payments Goldberg would make to them monthly principal and interest installments required to keep current the first and second mortgages on Country Club as well as Crestview. Although associated with Attorney Blair in the Country Club transaction, Lowe did not seek his legal advice or that of any other attorney until a dispute

over Crestview arose during the latter part of June.

Don Lacy, in charge of the Jackson office of Chicago Title Insurance Company, did not prepare deeds of conveyance on behalf of the sellers of either property, but prepared only the promissory notes as called for in each third mortgage and deeds of trust containing wrap-around provisions.

No satisfactory explanation has been made concerning why, since there was no tax advantage either to Goldberg or to Lowe on Crestview or, for that matter to the owners of Country Club, wrap-around mortgages were nevertheless prepared by Chicago Title and executed by Goldberg on or about June 28, 1979. Since Goldberg was committed to the sellers to absorb whatever cost might be incident to the transfers of the two apartments, it was obviously to his interest to have that cost, if not reduced to zero, held to a minimum. At any rate, Goldberg, or his representatives, contacted Northwestern Mutual which immediately requested that Goldberg submit a financial statement. Blair testified that he "did not inform Northwestern Mutual that the property was sold and did not intend doing so. Someone in Jackson Management [agents of Goldberg] did it."

In any event, Blair, upon receiving Goldberg's net worth statement, promptly forwarded it to Northwestern Mutual which agreed to the transfer by increasing the interest rate on its loan. Lowe, from the outset of his negotiations, emphasized that he was not on good terms with the lending officers of Unifirst Savings & Loan Association, the successor in interest of Bankers Trust, and was apprehensive that they would not consent to his transfer of Crestview. Lowe was assured by Jones, whose testimony was supported by Goldberg, that

---

4. As for the tax consequences, the parties understood that it would be to the advantage of a seller to enter into a wrap around mortgage rather than selling property by terms under which the purchaser assumed the senior mortgages in those situations where the sellers' depreciated cost was less than the amount of the assumed indebtedness. In such case it was deemed that the seller might be liable for capi-

tal gains on the difference between the depreciated cost to the seller and the greater amount of the debt assumed by the purchaser. However, no tax advantage would accrue to a seller whose depreciated cost basis was equal to or greater than the amount of an outstanding indebtedness assumed by the seller. No tax benefit would accrue to the purchaser in any eventuality.

Goldberg would pay Unifirst a fee of $10,-000 for its consent to the transfer "if he had to." Jones assured Lowe he would suffer no prejudice at the hands of Unifirst by signing the Crestview sales agreement. No contract was made by anyone with the Bank of Oxford as the second mortgage holder on both properties. As will later appear, wrap-around deeds of trust on Country Club and Crestview were drawn by Don Lacy of Chicago Title, apparently without reference to the original sales agreements, for they unmistakably relieved Goldberg as grantor of any obligation to pay installments of principal and interest on the first and second mortgages any longer than he might desire, and both deeds of trust expressly stated that in no event would Goldberg become liable for any indebtedness, including the third mortgage note executed to the sellers of Country Club and Crestview.[5]

## DISPUTE OVER CRESTVIEW CLOSING; SUBSEQUENT CLOSING ON COUNTRY CLUB

Despite the sellers' desires to have both closings occur at or about the same time, this did not materialize. Delays on Country Club were encountered when Goldberg proposed an exchange for other real properties which was first thought to have tax-free benefits for all parties. This alternate proposal was determined to be unfounded and was abandoned. In addition, there were other reasons for delaying the closing of the Country Club sale. Several days prior to June 26, John Mills, Jones' employee, presented the Crestview documents to Lowe, who expressed his dissatisfaction with them and stated that he would not go through with the deal. On June 26, Jones contacted Lowe and presented him with Goldberg's promissory note for $160,000 and a wrap-around deed of trust securing the first, second and third mortgages and providing for Goldberg, at his election, to make monthly payments to Lowe sufficient to meet the debt service on the third mortgage as well as the two prior mortgages. Also, the cash payment of $45,000 was immediately available to Lowe at Chicago Title. No deed had been prepared for Lowe to sign, nor did he inquire as to whether Chicago Title had drawn a conveyance as part of the closing papers. After examining the note and deed of trust, Lowe, who had only recently been given a copy of the executed Crestview sales agreement, stated he would not perform because the closing papers were not in accordance with the sales contract, that specifically there was no assumption by Goldberg of the mortgage debt owing to Unifirst and Bank of Oxford, nor did it contain any agreement to pay that indebtedness. Lowe particularly objected to the following provisions in the deed of trust set forth in Exhibit A, which is cited in the margin.[6] Lowe assigned several other reasons for termination, including the claim that the time for performance had expired.

According to Jones, Lowe made no objection to the form of the Crestview documents but said that since he had sold other property and was no longer in a financial bind, he was not interested in selling Crest-

5. These provisions are quoted infra in Footnote 6.

6. Grantor [Goldberg] assumes no personal liability, the property described herein shall constitute the Grantees sole collateral in the premises.

   As to each of the Senior Mortgages above described:
   Mortgagor [Goldberg] covenants and agrees to comply with all of the terms and provisions of said Senior Mortgage (except the requirement to make the payments of principal and interest thereon), and upon compliance by mortgagor with the terms and provisions contained in said senior mortgage and contained

herein, mortgagee will pay the installments of principal and interest from time to time due under said Senior Mortgage in accordance with its terms. Nothing contained herein shall require the holder of the note secured hereby to perform the terms or provisions contained in said Senior Mortgage required to be performed by mortgagor, its successors and assigns, except the payment of installments of principal and interest but only in accordance with the terms and provisions hereof. If mortgagor shall default in the performance of any term or provision contained in this mortgage, mortgagee shall not be obligated to pay any principal or interest under the Senior Mortgage.

view. Jones was positive that Lowe made no claim that any provision of the Crestview contract had been altered or that someone had, without his consent, written in the paragraph reading, "the property shall be the sole collateral for the payment of said notes." Once this dispute arose, neither Lowe, Jones nor Goldberg offered to change their positions.

Meanwhile, the Country Club sellers—Lowe, Blair and Leslie—in early June received from Mills $20,000 toward the cash payment and understood they would be paid $65,000 more, net after commissions, as soon as the deal was closed. Blair was then first informed by Lowe that Goldberg did not intend to be personally liable on the Country Club documents. The Country Club closing papers, as prepared by Chicago Title, were not delivered until several weeks later; Blair simultaneously prepared the deed to Goldberg from the Country Club owners. Though labeled "Assumption Warranty Deed," this instrument recited that the warranty of the conveyance was subject to the two prior mortgages held by Northwestern Mutual and Bank of Oxford "which said indebtedness is the liability of grantors herein." The promissory note to the Country Club owners, corrected in amount to $392,772.91, was dated June 28, 1979, and signed by Goldberg. Hand-printed in the form of the note were the words "No personal liability for B. Goldberg." The accompanying wrap-around deed of trust, Exhibit A, contained the identical provisions set forth in the Crestview deed of trust.

On or about September 10, the Country Club transaction was closed on the basis of the submitted documents, and was made retroactive to July 1, the date on which Goldberg took possession of Country Club. Blair testified that the closing papers did not at all conform to the Country Club sales agreement but he nevertheless caused the deal to be closed since "we had already spent the money," referring to both the $20,000 previously paid and the $65,000 paid at closing. Although Lowe mentioned that there were discrepancies between the sales agreement and the closing documents on

Country Club, Blair said that he and his associates decided to "bite the bullet" because of pressing financial circumstances confronting the sellers.

CONFLICTING TESTIMONY AS TO THE MEANING OF THE WORDS "AS-SUME" AND "THE PROPERTY SHALL BE THE SOLE COLLATER-AL FOR PAYMENT OF NOTES."

Jones testified that he had advised Lowe from the outset of the Crestview transaction that "Goldberg didn't sign nothing personally." This testimony was categorically denied by Lowe, who said that this idea was first broached to him by Jones about May 15, or several weeks after the signing of the Crestview contract, and again when Lowe objected to the form of the wrap around provisions in the deed of trust. Goldberg, of course, had no direct conversations with Lowe at any time, but on cross-examination Goldberg explained that 12 years ago he got "burned" on a $100,000,000 transaction and resolved never to become personally liable on any business venture. Goldberg then gave his interpretation of the critical words "assume" and "property to be the sole collateral" as follows:

THE COURT:

Q. if the contract in fact calls for you to have personal liability on the first and second mortgages, you have not performed.

A. If the contract said that, I would not have performed, because under no circumstances would I close the deal on that basis. That is not my deal. That's not what we signed up for. (T. 522)

. . . . .

Q. Is it true that at this time you are unwilling to assume as personal liability the first and second mortgages?

A. Yes, sir. (T. 524)

. . . . .

Q. Do you know what assumption means in the ordinary sense of the word? Assumption of a mortgage? What does it mean to you?

A. Well, to me, to assume a mortgage is to assume an obligation. Like if you buy a car and you assume the payments, you pay the ninety dollars a month. I think we are getting it all confused up with this personal guarantee thing. Now, I intended to assume the mortgage but not to personally guarantee. And the contract specified explicitly up and down, inside and out, and on every document and on every deal, that there would not be a guarantee. I got burned once as a young man and I didn't want to get burned again. (T. 526–27)

MR. FREELAND:

Q. So your position then, as I understand your testimony, is that you are willing to assume the mortgage provided you can do so without taking on any personal responsibility for its payment?

A. Exactly as we did in the other one (Country Club), yes.

THE COURT:

Q. You are merely taking on—

A. Sir?

Q. You are taking on to make the payments.

A. Yes, sir.

Q. But you would not be held if you could not make the payments.

A. That's right. I didn't want to get in the same position as the people who owned it. (T. 527–28)

MR. FREELAND:

Q. But your position that you were taking with Mr. Jones throughout this transaction was that you were not willing to take on any personal liability as to any part of the debt on Crestview.

A. That's correct.

Q. And you were relying on Mr. Jones to present it in that fashion to Mr. Lowe.

A. Yes, sir.

Q. And you don't know whether he did or not.

A. Oh, yes, sir. I have a contract that's signed by Mr. Lowe stating that there would be no personal guarantee.

The property will be the sole collateral for the debt. (T. 532)

. . . . .

Q. And I take it it is your position that as you understood the contract that meant that you would have to assume no personal liability whatsoever.

A. Yes, sir. (T. 533)

Lowe testified that at the time he signed the Crestview contract he was under the impression that Goldberg would not only assume and be obligated to pay the prior mortgages but would have personal liability on the $160,000 third mortgage note (T. 64, 92, 672, 676). Attorney Blair testified that he understood the word "assume" to mean the purchaser would assume the present loans and the liability therefor, and that he would not expect any collateral for Goldberg's note other than the property subject to the mortgage, i. e., "he didn't expect Goldberg to put up his Cadillac, or whatever, in addition to the property . . . which was to be the sole collateral for the note." (T. 563). Lacy, the drafter of the wrap-around mortgage, testified he was advised by Jones that Goldberg was to have no personal liability on any mortgages (T. 196), but he acknowledged that the Crestview contract, on the basis of which he prepared the note and wrap-around mortgage, called for "an assumption." (T. 197). Jones testified that when he drafted the original Crestview agreement "Goldberg told him he was willing to assume the indebtedness of it and payment of it but not the liability of it." (T. 319). Jones went on to explain that his understanding was that by assuming the debt, Goldberg as purchaser would have to pay or be foreclosed and otherwise "lose any equity [Goldberg] might have in it," but as purchaser he "wouldn't be stamped with any personal obligation." (T. 321). Jones was of the opinion that the insertion of the words "the property would be the sole collateral for the notes," meant that Goldberg was not to be personally liable for the payment of the first, second or third mortgage but "he was to assume the payment of those mortgages each and every

month ... and if not paid ... Mr. Lowe would have the property back," and Goldberg would have lost his equity. (T. 325).

Because of the court's disposition of this case on other grounds, it is unnecessary to consider Lowe's defense that Jones, as agent, breached a fiduciary duty of loyalty owed to him as principal from the inception of the contract negotiations and until the time for performance by becoming allied with Goldberg as a business partner and by seeking to represent Goldberg's interest to Lowe's detriment.

## II.

In spite of the rather lengthy recital of facts, this case turns upon simple and well-settled principles of contract law. As the parties acknowledge, the substantive law of Mississippi is controlling since the contract was executed in part, if not wholly, in Mississippi, it related to Mississippi real property and was to be performed in this state. Mississippi unquestionably has the most significant relationship with the transaction and the greatest concern with the specific issues arising out of this litigation. *Mid-Continent Telephone Corp. v. Home Telephone Co.*, 319 F.Supp. 1176, 1187–88 (N.D.Miss.1970).

At trial, counsel for both parties insisted that the written Crestview contract was clear and unambiguous. Goldberg's position was that by contractual terms he was expressly relieved of personal liability, while Lowe's contention was exactly the opposite. If a written contract is clear and unambiguous, settled Mississippi jurisprudence, of course, is that "parol testimony is inadmissible to contradict or substantially change the legal import of a written agreement." *Valley Mills, Div. of Merchants Co., Inc. v. Southeastern Hatcheries of Miss., Inc.*, 245 Miss. 71, 145 So.2d 698, 702 (1962). *Barnett v. Getty Oil Co.*, 266 So.2d 581 (Miss.1972). *See* 17 Am.Jur.2d, Contracts, § 241. It is equally clear that in federal diversity cases, the parol evidence rule is one of substance and must be applied with the same effect as if the case were in state court. *Freeman v. Continental Gin Co.*, 381 F.2d 459 (5 Cir. 1967) (applying Mississippi law).

In Mississippi, an exception to the parol evidence rule allows extrinsic evidence only if the written agreement is ambiguous or indefinite. *Freeman* at 463. *Barnett* held that if "a careful reading of the instrument reveals it to be less than clear, definite, explicit, harmonious in its provisions and free from ambiguity throughout, the court is obligated to pursue the intent of the parties and, to determine the intent, must resort to extrinsic aid." At 586.

Mississippi also aligns itself with general authority that the interpretation of words and other manifestations of intent to form an agreement, or having reference to the formation of an agreement, is the ascertainment of the meaning to be given to such words and manifestations, and that the ordinary meaning of language is to be given words which are used in written contracts unless circumstances show that a different meaning is applicable. *Williams v. Batson*, 186 Miss. 248, 187 So. 236, 238 (1939), citing 1 Restatement Contracts § 236, and 3 Williston on Contracts (Rev. Ed.) 601. Beyond doubt, words used by parties who are experienced real estate investors, as in the case sub judice, are to be accorded the usual meaning reasonably given by persons engaged in commercial transactions. No different meaning may be ascribed to the words contained in the Crestview contract.

That a difference of interpretation may later arise between the parties does not constitute an ambiguity or create an exception to the parol evidence rule.

> In other words, the object to be attained in construing a contract is to ascertain the meaning and intent of the parties as expressed in the language used and to give effect to such intent if it does not conflict with any rule of law, good morals, or public policy. It is not necessarily the real intent, but the expressed or apparent intent, which is sought. The court will not attempt to ascertain the actual

mental processes of the parties in entering into the particular contract; rather the law presumes that the parties understood the import of their contract and that they had the intention which its terms manifest.

If the language used by the parties is plain, complete, and unambiguous, the intention of the parties must be gathered from that language, and from that language alone, no matter what the actual or secret intentions of the parties may have been. Presumptively, the intent of the parties to a contract is expressed by the natural and ordinary meaning of their language referable to it, and such meaning cannot be perverted or destroyed by the courts through construction.

17 Am.Jur.2d § 245.

■ We hold the Crestview contract clear and unambiguous, and that its terms may not be subject to change or alteration by whatever contrary subjective intention might have been in the mind of either party. There can be no doubt that the "assuming" of the first and second mortgages rendered Goldberg primarily liable for the senior mortgage indebtedness. Had the intent been otherwise, the parties would have made the transaction "subject" to such mortgages. Since the assumption was explicitly stated, this suffices to show a clear intent on the part of the purchaser to assume the liability for paying the mortgage debt. *Malone v. United States*, 326 F.Supp. 106, 110 (N.D.Miss.1971) (applying Mississippi law),[7] *aff'd per curiam*, 455 F.2d 502 (5 Cir. 1972). Though factually different, the principle of *Malone* casts primary personal liability upon Goldberg, regardless of his undisclosed, actual intention.

Goldberg urges that the clause, "The property shall be the sole collateral for the note," exculpates him from personal liability, or at least renders the contract provisions so contradictory and repugnant to each other as to allow extrinsic evidence to explain their meaning. These contentions are wholly without merit. In the first place, the $160,000 third mortgage note as signed by Goldberg rendered him personally liable on that negotiable instrument. Neither the Crestview contract nor Goldberg's $160,000 note negated the maker's personal liability, such as was later done by clearly expressed words on the Country Club note. Mississippi's Uniform Commercial Code, § 75-3-401 (1972), implicitly means that the signature of a party on a promissory note, without more, creates personal liability. To relieve the maker of personal liability, unmistakably clear language is required. The Crestview contract contained no such words as to the $160,000 promissory note.

Moreover, in common parlance, "sole collateral" means "sole security," or that which supports the obligation of the maker of a negotiable instrument. Collateral may consist of an endorsement of a third party, or the pledge or mortgage of personal or real property; but whatever its form, its function is to stand by the side of, or support, the *promise of the maker to pay*. The Uniform Commercial Code contains a clear definition of "collateral;" § 75-9-105 provides that collateral "means the property subject to a security interest . . . ." Webster's Third International Dictionary defines the word "being or belonging to an *obligation or security attached to another to secure its performance.*"[8] It is inescapably clear that the phrase "the property shall be

---

**7.** For like definitions of "assume," see *Larson Constr. Co. v. Oregon Automobile Ins. Co.*, 450 F.2d 1193, 1195 (9 Cir. 1971). "The use of the word 'assume' . . . means to take to or upon oneself." See Webster's Third New International Dictionary: "to take to or upon oneself; to take over as one's own (the debts of another)."

**8.** Plaintiff may derive no comfort from the definition contained in Black's Law Dictionary, Revised 4th Edition, p. 327, where the word collat-

eral is defined "by the side; at the side; attached upon the side . . . additional or auxiliary; supplementary; cooperating, accompanying as a secondary fact . . ." The general definition given for "collateral security" in Black's is footnoted by judicial decisions that "collateral security, in bank phraseology, means some security additional to the personal obligation of the borrower, or pledge of negotiable paper, shares of corporate stock and the like."

the sole collateral for said notes" means that no other security to pay the mortgages shall be given. As Blair aptly stated, Goldberg did not have to "put up his Cadillac or whatever else" as collateral. It surely does not denote an intention that Goldberg was immune to any personal obligation to the senior mortgages or even on Lowe's third mortgage note. It was incumbent on Goldberg, if he intended to place at risk no more than his cash payment, to use words clearly conveying precisely that meaning.

Even if the two clauses "assume" on the one hand and "the property to be the sole collateral" were deemed contradictory of each other—a proposition which we do not accept—it is well established that "the words of a contract shall be given a reasonable construction where that is possible, rather than unreasonable one; and the court should likewise endeavor to give a construction most equitable to the parties, and one which will not give one of them an unfair or unreasonable advantage over the other ... (citing authorities). 'Construction of contracts which would make them unfair or unjust are to be avoided, *unless the terms are unambiguous and express.*'" (Emphasis added). *Rubel v. Rubel*, 221 Miss. 848, 75 So.2d 59, 65 (1954), *quoting McCain v. Lamar Life Ins. Co.*, 178 Miss. 459, 172 So. 495, 500 (1937). Applying this rule of interpretation to the case at bar, the court would have to hold that it was the parties' intention for Lowe to part with an income-producing property worth more than a half million dollars for less than one-tenth of its value in cash as the only certain consideration, be held in jeopardy to pay $320,000 at any time Goldberg decided against further payment, and hold a $160,-000 promissory note uncollectible from the maker whose personal net worth made him several times a millionaire. Lowe, of course, was free to make such an undertaking if he so chose, but the terms of the Crestview agreement surely are not to be construed as providing for risk-taking by the seller of this magnitude. That the

Country Club owners did later elect "to bite the bullet," by closing the sale of a more valuable property upon terms that "Goldberg is not liable for nothing," and at increased interest rate on a very substantial first mortgage, is of no relevance whatever in determining the rights and obligations under the Crestview contract. If the Country Club transaction has any significance, it serves to illustrate that parties, for whatever reason, by mutual consent, may abandon prior agreements and make others dictated by circumstances of the moment.

We therefore hold that Goldberg breached the terms of the Crestview contract by not performing according to its terms, and is thus entitled neither to specific performance, damages, or other relief. On the contrary, Lowe is entitled to recover from Goldberg on his counterclaim $10,000 plus interest as liquidated damages for breach of contract.[9] Lowe's claim for punitive damages, including attorney fees, must fail because the court finds from the evidence that Goldberg did not deliberately or wantonly breach the contract in such manner as to constitute an independent tort. Goldberg thought, though erroneously, that the contract provisions irrevocably committed him to no more than the cash down payment. We can understand his desire that having once been "burned on a business venture," as he termed it, he was unwilling to be "scorched" by personal liability on the purchase of Crestview. While his use of words in the agreement does not save him from breach of the written contract, his good faith subjective intention acquits him of malice or oppressive conduct, and makes inappropriate an award of punitive damages against him.

## REVIEW AND DISALLOWANCE OF MAGISTRATE'S SANCTIONS

We briefly consider the magistrate's recommendation that Goldberg be liable for sanctions under Rule 37(a)(4), F.R.Civ.P., for $1,436.40 for expenses, including attorney fees, for his failure to attend discovery

---

9. Jones has no claim for commission on Crestview's breach because, as he testified, his interest as broker was fully paid out of the Country Club sale.

424

deposition noticed for March 21, 1980. The magistrate initially held that sanctions should not be imposed. Supplemental proceedings before the magistrate sought to have Goldberg's suit dismissed, and this was denied after a hearing on June 11, 1980. Goldberg thereafter moved for the appointment of a receiver to take charge of the apartment property pendente lite. This was denied by the magistrate on September 5. Defendant renewed his motion for sanctions and attorney fees, as first sought March 21, and for subsequent legal services, including resisting plaintiff's motion for a protective order. The magistrate decided to impose sanctions as originally contemplated for Goldberg's failure to attend his own deposition. This change of view was largely dictated by a disclosure that Goldberg personally owned an airplane and did not have to rely upon commercial air lines, which allegedly prevented his attendance at the deposition. This order is assailed by Goldberg's counsel as clearly erroneous and an abuse of discretion.

The court has reviewed this ongoing disputation from the filing of Goldberg's suit, and has concluded that, although the heat of the controversy somewhat clouds the issue, the original holding of the magistrate that Goldberg's motion for protective order was justified and his failure to appear did not require imposition of sanctions was correct. The subsequent hearings before the magistrate do not provide a rational basis for reversing the original view that sanctions not be imposed. Though reluctant to overrule this able magistrate, we find his later holding to be clearly erroneous and an abuse of discretion. Goldberg's appeal for relief is sustained.

Let judgment issue accordingly.