Donald E. WILDMON and American Family Association, Inc., Plaintiffs–Counter–defendants,

v.

BERWICK UNIVERSAL PICTURES, Uptown Media Associates, Inc., Paul Yule, Jonathan Stack, Channel Four International and Devillier and Donegan Enterprises, Defendants–Counter–plaintiffs.

Civ. A. No. EC 91–320–D–G.

United States District Court, N.D. Mississippi, E.D.

Sept. 8, 1992.

Benjamin J. Bull, American Family Ass'n, Tupelo, Miss., for plaintiffs-counter-defendants.

Kay L. Trapp, Tupelo, Miss., Luther T. Munford, Walker W. Jones, III, Jackson, Miss., Martin Garbus, Russell Smith, Kyran Cassidy, New York City, for defendants-counter-plaintiffs.

## MEMORANDUM OPINION

DAVIDSON, District Judge.

To a producer, a film is more than the sum of its parts. Each decision reflects his or her work, so that the parts become a coherent and, in this case, prize-winning whole.[1] But what, if any, are the rights of

---

**1.** The film which is the subject of this lawsuit, "Damned in the U.S.A.," has received numerous commendations in the documentary film industry including the Chicago International Film

participants who give the work spirit and validity? How much control should they have on the way their contribution is projected? In October of 1990, a British producer approached Tupelo religious leader and embattled arts funding opponent Donald Wildmon about his moral convictions and extensive work in the censorship arena.[2] Wildmon responded that he rarely granted interviews, but would consider doing so under certain conditions regarding its use. The final, integrated statement of these conditions is the subject of the instant lawsuit. Both parties focus their attention on a single paragraph of a contract written by Wildmon's attorneys and signed by British producer Paul Yule in December of 1990. Wildmon reads the paragraph as prohibiting the presentation of his interview in any form without his permission except by Channel Four television in Great Britain. Defendants, producers and potential distributors of the resulting film documentary, read the agreement as restricting only the distribution of unedited film taken during Wildmon's interview. Wildmon's testimony makes clear that it is not the accuracy of the interview he disputes, but its juxtaposition in the documentary with subjects he has challenged for nearly two decades.

On August 11 and 12, 1992, the undersigned held an expedited hearing on defendants' counterclaim for declaratory judgment pursuant to Fed.R.Civ.P. 57 and 28 U.S.C. § 2201. The court informed the parties that it would use the hearing as an opportunity to consider plaintiffs' motion for summary judgment on the primary claim for breach of contract.[3] The primary claim and the counterclaim for declaratory judgment focus on the same evidence. This court has jurisdiction pursuant to 28 U.S.C. § 1332. By a previous memorandum opinion and order, the undersigned ruled that the court would be the trier of fact on both claims.[4] The stakes are high. To Wildmon, unbridled release of the film in the United States is a vehicle for the exhibition of work he protests. To Yule and his co-defendants, Wildmon's interpretation of the agreement amounts to nothing less than full distributive control.

### FACTUAL BACKGROUND

1. The Correspondence, the Contract and the Interview

Defendant Channel Four is a government-owned public service broadcaster that derives its income largely from overseas sales. In October of 1990, the commissioning editor for Arts Programmes for Channel Four suggested that the station explore a project on censorship and arts in the United States. The project was to focus particularly on the work of Robert Mapplethorpe and other artists who have been the target of Congressional debate on public funding. Mapplethorpe, now deceased, was a homosexual artist whose subjects included unquestionably graphic images. Having worked with Yule previously, Channel Four approached Yule and his production company, Berwick Universal Pictures,[5] about undertaking preparation and research for the film. At the time, the station referred to the project by the provisional title of "Robert Mapplethorpe." The

Festival's "Silver Plaque Award" and an International Emmy for arts documentary. Various international film festivals have invited showings of the film, and in June of 1991, the film was selected to open the Margaret Mead Film Festival, a respected international event for the exhibition of documentary films.

2. Wildmon has been at the forefront of a well-publicized debate in this country on public funding for the arts. He has also single-handedly led a crusade to clean up television programming by encouraging consumers to boycott products of companies which advertise on shows that are sexually explicit, violent or demeaning to Christian values.

3. Plaintiffs have also advanced a claim for tortious breach of contract.

4. By a memorandum opinion and order dated June 18, 1992, the court denied plaintiffs' belated demand for a jury trial. In the same opinion and order, the undersigned agreed to consider defendants' counterclaim for declaratory judgment in an expedited hearing.

5. Berwick Universal is also a defendant in this action.

project was to be part of a larger series about attempts in the United States to place moral limits on public behavior.

During his research, Yule learned that Wildmon and his organization, the American Family Association (A.F.A.), were key opponents of public funding for the Mapplethorpe exhibits. Yule wrote to Wildmon by facsimile on October 29, 1990, and formally requested an interview. The letter stated in pertinent part:

Perhaps I should explain, before anything else, why it is that I am so keen to meet you. For some time now, I have been trying to make a Documentary Film which presents *fairly* the ethical arguments for and against censorship....

I want to make a film that will allow you and The American Family Association to be seen in a fair light, something that I am not sure has always been the case. I want to present an unbiased film of you and your beliefs. And that, ultimately, should be what the film is about ...

It seems to me that this subject has been much misrepresented—the debate has tended to focus on sensational issues rather than on the weighty moral dilemmas involved ...

(emphasis in original).

In his response written that same day, Wildmon stated that he rarely granted interviews and that by using the term "censorship," Yule already reflected a media bias. However, he went on to state that he "might be interested in doing an interview" under certain conditions. He wrote:

Should I grant an interview[,] I would have to know how the interview will be used. A contract would also have to be signed, containing a substantial damage clause, forbidding the interview or any part of the interview being used in any manner other than that stipulated in the contract without my prior written permission. In other words, if I granted you an interview to be used on Channel Four, the interview nor any parts of the interview could be used for any other purpose nor sold or rented or given to any other source—the public networks (NBC, CBS, ABC), PBS, cable companies,

etc. including the television outlets in England and the other countries in Europe.

Wildmon added, "All I have ever asked is that our views be fairly and accurately and fully presented."

In Yule's next letter of November 1, 1990, Yule wrote that he appreciated Wildmon's concerns, that he would need to see a draft of Wildmon's proposed agreement, but that Channel Four was not opposed to such an agreement in principle. In mid-November, Wildmon supplied Yule with a copy of a previous, model contract entered into by print journalist Robert Mendenhall in which Wildmon agreed to grant an interview for print on condition that it not be made available to "sexually oriented magazines." Entitled "Release and Agreement Not to Disclose," the Mendenhall agreement stated:

The undersigned, Robert Mendenhall, agrees to refrain from making available the contents of the interview conducted on July 27, 1988 with Rev. Donald E. Wildmon, Executive Director, American Family Association, in a manner inconsistent with this agreement. In exchange, Rev. Wildmon agrees to participate in the interview for publication in a manner not otherwise proscribed by this agreement.

Mr. Mendenhall agrees to specifically refrain from making the interview available for publication in sexually oriented magazines namely, but not limited to, *Playboy, Penthouse,* or *Hustler.*

Whether Wildmon told Yule that he would have to sign to these very terms or similar terms is a matter of dispute; the court finds that Wildmon told Yule that the terms to which Yule would have to agree were similar.

At about this time, John Willis, Channel Four's Controller of Factual Programmes, wrote a letter to Wildmon intended to illustrate support for Yule's project on the part of Channel Four. The letter referred to the upcoming plans for an interview and stated:

Mr. Yule has shown us your letter to him of October 29th and the contract which

you gave him at his meeting with you in mid-November and I confirm that we have read these and agree to the conditions contained within them.

However, Willis testified that he did not read the October 29 letter or the Mendenhall agreement and instead relied on the advice of the station attorneys. The station understood that Wildmon previously had an "unhappy experience" with interviews taken out of context, and thus was willing to ensure that the interview appeared only in the film, he said. At the same time, neither he nor the attorneys doubted that the producers could take the interview and place it in a film available for worldwide distribution.

The culmination of the above negotiations occurred on December 3 and 4, 1990, when Yule visited Wildmon at the A.F.A. offices in Tupelo and began two days of filmed interviews. On the initial day of shooting, Wildmon presented Yule with a contract which is the subject of this dispute. Like the Mendenhall agreement, the contract began with Wildmon offering his participation in return for the interviewer's promise to refrain from making "the contents of the interview" available in "a manner inconsistent with this agreement." However, where the next paragraph of the Mendenhall agreement has the interviewer promising to refrain from making the interview available to *sexually oriented magazines*, the next paragraph of the Yule agreement refers to *any other media outlet*. It states:

> Mr. Yule agrees specifically to refrain from making the interview available to any other media outlet including any portions that are not used in the television presentation made by Berwick Universal Pictures, London for Channel 4. In addition, Mr. Yule agrees that any material obtained from the interview or derived from this interview shall not form the basis of any other media presentation or [sic] in England, the United States or any

other country without written permission from American Family Association.

The agreement contains a liquidated damages provision and a promise for reimbursement of fees and costs in the event of a breach. It concludes with a standard integration clause which states that the agreement is "the complete agreement" and that "any prior agreements are void." When on the second day of interviews Wildmon became aware of the extensive involvement of Jonathan Stack, an American co-producer,[6] he required both Stack and Yule to sign another agreement on December 4, 1990 which was identical to the one Yule alone had signed the day before. Yule stated that he signed both agreements without forwarding copies to Channel Four in London. Both producers believed the release to be the same one that Channel Four had approved in the form of the Mendenhall document. Like Yule, Stack understood the agreement as limiting distribution of footage of Wildmon and the American Family Association; neither producer viewed the agreement as restricting distribution of the film itself.

Wildmon appears to have been the only interviewee who asked the producers to sign a release. The reverse was true for other interviewees who signed releases favoring the producers. In these releases, the participants granted "all necessary waivers of any moral rights relating to any material or work" and agreed that their contributions could be "advertised and used in the exploitation of the programme at any time … throughout all countries of the world." Some participants signed the agreements after changing portions they found objectionable. For example, interviewee David Albanese deleted the portion of the release allowing advertisement and exploitation, while Christie Hefner of *Playboy* inserted additions to the agreement. No such form agreement was signed by Wildmon.

---

**6.** Stack is employed by Uptown Media Associates, Inc., a New York corporation. Uptown is a co-producer of the film and a co-defendant in this action along with Yule, Stack, Berwick Universal, and Channel Four. The sixth and final defendant in this action is Devillier Donegan, a United States corporation and Channel Four's designated representative in the United States. Devillier Donegan has been assigned a copyright interest in the film.

While negotiations between Wildmon and Yule progressed in October and November, Channel Four undertook its own agreements with Yule and Berwick Universal for development work on the film. In one of these agreements, Yule promised to "use [his] best endeavours to obtain the entire copyright in all material" and "to obtain all necessary consents to permit the Development Work and the Programme to be produced and exploited throughout the world." Another agreement set a budget of 136,247 pounds for the film, although defendants claim that the amount actually invested was 150,000 pounds or $270,000. Because these figures are not challenged, the court accepts them as true. Willis stated that such a large outlay would have been impossible had the station intended to limit showings to Europe. Moreover, the station would have had grave misgivings about surrendering control no matter what the outlay of funds because relinquishing control is tantamount to relinquishing an obligation to the viewing public.

Although the court finds Willis' testimony to be credible, it is only somewhat helpful in understanding the meaning of the December agreement. This is because neither Willis nor Channel Four's attorney, Don Christopher, read the actual agreement signed by Yule and Stack. More indicative of the parties' intent are the five to six hours of unedited film featuring Wildmon, his hometown of Tupelo, and the A.F.A. offices. This footage suggests Wildmon knew his interview to be part of a larger project, over which he had no editorial control. At the same time, the segments evince a mutual respect between interviewer and interviewee, one that Yule was perhaps disinclined to disrupt because of the importance of the interview. By this time, Yule and Wildmon were on a first-name basis, and Wildmon had reason to believe Yule would be fair.[7] At no point does Yule state that the Mapplethorpe art and other works of controversy are to be shown in conjunction with Wildmon's interview, and at no point does Wildmon ask.

## 2. The Release of the Film and the Post–Contract Conduct of the Parties

In early 1991, Yule informed Wildmon by telephone that the Public Broadcasting System (PBS) in the United States had expressed interest in the as-yet-uncompleted film. Wildmon contends that Yule requested his permission for a PBS showing at that time,[8] while Yule contends that the phone call was merely a courtesy that did not resolve a PBS showing one way or the other. Given the cordial tone of a letter written by Yule to Wildmon shortly afterwards on April 17, 1991, the court finds Yule's recollection to be more accurate and that the issue of permission had not yet arisen between the two parties.[9] Channel Four showed the film on April 15, 1991 to a national television audience in Great Brit-

---

**7.** Two portions of Wildmon's interview particularly reflect his knowledge that he would have no editorial control over the final product, but that he placed a certain trust in Yule. He states:

Once you leave here, you're going to edit it any way you want to edit it. There has to be a sense of ... some sense of trust. As I told you before you came in, I have to believe that you're going to be fair. Now once you leave here, there's no way in the world that I can control what you do. You're going to do whatever you want to do, and that's your prerogative. But if you ... aren't fair, then it's my prerogative that next time Paul says, 'Hey, I'd like to do an interview, a follow-up interview with you,' I'll say, 'Get lost.' ... Why am I doing [this interview]? ... I guess because I trust you; I guess that's the only reason I'm doing it.

In another part of the interview, Wildmon refers to the term "censorship" and states:

[E]verything that's ever been shown, everything that's ever been printed has been censored. I'll give you an example: You're going to take this interview back; you're going to take this material that you've shot here from two days and you're going to do a film. Obviously you're not going to be able to show everything that we've done, because you don't have that kind of time, so you're going to make a selection. You're going to call it 'editing': you're going to select this or that to paint a picture that you want to paint. You know what you're going to say about me or where you're going to come out about me—I have no earthly idea ... That you call 'editing.'

**8.** Wildmon contends that he refused such permission until he could see the completed film.

**9.** In his April 17 letter, Yule simply states that "the possibility of a PBS showing did not materialise ..."

ain. The documentary resulted in nine unfavorable comments from viewers and six favorable comments, so that the overall response was no more extraordinary than that received for other broadcasts.

While fairly airing Wildmon's views, the film depicts the work of many of the artists he has challenged, including Andres Serrano's "Piss Christ," featuring a Crucifix purportedly submerged in urine, and many of the Mapplethorpe photos. The film also includes a running segment by comedian Jimmy Tingle which caricatures the antifunding stances of Wildmon, North Carolina Senator Jesse Helms and other conservative leaders. Pictures of people performing deviant and "dangerous" sexual acts were among those eliciting an unfavorable response from a British viewer.

At the time of Yule's April 17 letter, Wildmon had not yet seen the film. The letter forewarns him about its content:

> The film you will see is the product of many months of hard work and I have tried to be as faithful as I could to what we talked about ... You may be a little surprised by some of what you see, but I've done my best to put across your ideas and perspective in a fair way, to show sympathetically where you are coming from ...
>
> I would urge you to watch the film carefully, as a whole, and also to bear in mind that this was made essentially for [a] British audience. You will find in the film some of the images that you have fought long and hard to have removed from mainstream culture. You will see by the end of the film why it is critical to show the images and the lifestyle behind them ...

When asked about the reference to a British audience, Yule testified that he did not mean to imply that an American version would be made or that the film was only intended to be offered to British audiences. When asked why he expected Wildmon to be surprised at the images, he stated: "In-

terviewees always are surprised when they see themselves in the film." Particularly because other participants in the film had spoken against Wildmon in a "forthright" manner, he felt that he did not want Wildmon to see the film "cold." [10]

Wildmon contends that he did not view the entire film until June 24, 1991, when Yule wrote to him of a possible New York showing. However, it is undisputed that Wildmon received the film around the time of Yule's April 17, 1991 letter. Meanwhile, communications continued within the Channel Four offices as the station prepared the film for distribution. On May 3, 1991, Channel Four's Programme Sales Manager Frances Berwick wrote to Yule to confirm distribution rights in the film and stated that great interest in it had been expressed by Showtime, PBS and the Arts and Entertainment network in the United States. On May 21, Jeremy Kimberlin, a negotiator in the station's sales department, sent a letter to Yule which indicated the outstanding clearances necessary for film sales. Kimberlin's list does not refer to the need for clearances from Wildmon. On May 7, however, Technical Coordinator Phil Sissons, who did not appear at the hearing, wrote to Yule about material that had to be collected before the film could be distributed to Spain and Sweden. He stated, "I understand that you are waiting until you have received confirmation of the clearances involved, including a release from the Reverend Wildmon." Yule testified that Sissons must have been confused about the need for a release; however, Yule sent a copy of Sissons' letter to Wildmon that same day with the following explanation:

> Enclosed is a letter which I have today received from Channel Four, from which you will see that the film has generated a great deal of interest. Can I assume that you have no objection to these sales?

---

10. Yule's testimony that he did not wish Wildmon to view the film "cold" in light of the criticisms leveled against him by others in the debate was credible. Yule's testimony about the other aspects of the April 17 letter was less

convincing. Although the court finds that Yule did not clearly explain either of these references, as will be noted below, the most vital evidence must be the agreement itself.

Wildmon's reply was brief: "You have my permission [to] show the film on SVT–1 in Sweden and Canal Plus in Spain." Defendants suggest that Yule's letter was merely a courtesy shown to a respected interviewee; unrestricted license to distribute the film was clear by virtue of Channel Four's decision to undertake a sale to Spain and Sweden by the time of Wildmon's reply. However, letters from Yule to Sissons and Frances Berwick shortly thereafter also refer to Wildmon's "permission." His letter to Sissons states: "I enclose Wildmon's fax to me in response giving his permission." His letter to Frances Berwick states: "As you may have heard, Donald Wildmon has given his permission for the sales to Spain and Sweden, so I think that we can assume that there is not going to be any problem in the future over his clearance."

On or about June 24, 1991, the American Museum of Natural History in New York announced that the Film had been selected from hundreds of entries to open the Margaret Mead Film Festival. In a letter congratulating Yule for this honor, Sissons again expressed concern about Wildmon's release: "I will assume unless I hear otherwise that the letter you received from Reverend Wildmon ... allows us to show the film in New York, and indeed, world-wide." Yule again sent a copy of Sissons' letter to Wildmon, at which point Wildmon replied:

> Because of the graphic content of Damned in the USA, I cannot grant my permission for the film to be shown in the United States.
>
> I regret that this is the case, but this is precisely the reason for the contract.

When an article in *Variety* indicated that the film was being released in the United States, Wildmon told Yule by letter that he intended to sue under the contract. Shortly thereafter, he and the A.F.A. commenced this action. Understandably, the litigation has discouraged potential distrib-utors and exhibitors. The defendants have halted sales of the film until the dispute is resolved, although they appear to be distributing it in a non-commercial manner to festivals and exhibits.

## CONCLUSIONS OF LAW

The court will take up the motion for declaratory judgment first because a determination on the counterclaim for declaratory relief may dispose of the summary judgment motion on the primary claim. The court agrees that declaratory relief is necessary and that it "will aid in clarifying and settling the legal relations in issue" and "afford the parties relief from ... uncertainty." *Greater Los Angeles Council on Deafness, Inc. v. Zolin,* 812 F.2d 1103, 1112 (9th Cir.1987). As the parties acknowledge, the substantive law of Mississippi is controlling because the contract was executed in Tupelo.

The first inquiry in a case of contract obligations is whether the meaning of the agreement is clear. When the provisions of a contract are clear and unambiguous, the intention of the parties must be ascertained solely from the wording of the contract. *Barnett v. Getty Oil Co.,* 266 So.2d 581, 586 (Miss.1972). "Under Mississippi law, words of a contract are to be given their ordinary meaning." *Mississippi Power & Light v. United Gas Pipe Line,* 760 F.2d 618, 622 (5th Cir.1985). The court has painstakingly read and reread the December agreement and concludes that neither parties' meaning is readily obvious. One could read the agreement as preventing the distribution of the interview in any form and any manner except for scheduled showings by Channel Four in Great Britain. One could also read the agreement as preventing the distribution of only the footage taken of Wildmon to other producers and interviewers for use in other productions. Despite thorough arguments on both sides,[11] the court is convinced that

---

11. Wildmon's attorney pointed out that if the interview were allowed to become something different when made a part of a film, the producers could have simply taken Wildmon's entire interview, labeled it a "film," and offered it for unlimited distribution, thereby vitiating the agreement. Defendants' attorney countered that Wildmon recognized that the interview was to become part of a different project by referring to his interview in the agreement as the "interview" and by referring to the film as "the television presentation." Although the court

the agreement is indeed ambiguous and that extrinsic evidence is needed to parse its meaning.

■ Two circumstances occur when a determination of rights and obligations turns on an ambiguous meaning. First, the question of interpretation becomes a question of fact. *Kight v. Sheppard Building Supply, Inc.*, 537 So.2d 1355, 1358 (Miss.1989). Second, the trier of fact may and should resort to parol evidence. *Goldberg v. Lowe*, 509 F.Supp. 412, 421 (N.D.Miss.1981). In a federal diversity case such as this, this rule on parol evidence "is one of substance and must be applied with the same effect as if the case were in state court." *Id.* Mississippi case law only perfunctorily explains the relationship of the parol evidence rule to other rules on interpretation. However, guidance can be found in the Comment to the Restatement of Contracts (Second) § 213, which states that the parol evidence rule is not really a rule of interpretation; rather, it "defines the subject matter of interpretation" by "render[ing] inoperative prior written agreements as well as prior oral agreements." [12] Thus, if the parol evidence rule were operable, all of the pre-contract negotiations in this case—including Yule's introductory letter of October 29, Wildmon's return letter of that same date and the Mendenhall agreement—could not be considered because the December agreement was the final embodiment of the parties' terms. However, by virtue of ambiguities in the agreement, this pre-contract evidence may be considered.

■ Also relevant is any post-formation evidence that evinces "the construction which the parties themselves have given to a contract in the course of their life together under it." *UHS–Qualicare, Inc. v. Gulf Coast Community Hospital,* 525 So.2d 746, 754 (Miss.1987) (citing RESTATEMENT (Second) of CONTRACTS § 202(4) (1981)). Under the Restatement, "any course of performance accepted or acquiesced in without objection is given great weight in interpretation of the agreement." RESTATEMENT (Second) of CONTRACTS, § 202(4) (1981). As with all rules in aid of interpretation, however, the factfinder must continually return to the four corners of the agreement as the most vital embodiment of the parties' intent.

■ Looking to the pre-contract negotiations first, the court finds that the preliminary correspondence did not give the producers reason to believe that the film could only be shown in Great Britain. Of course, Yule and Channel Four were eager to secure Wildmon's participation because they realized his interview was essential to their project. However, it is highly unlikely that they understood Wildmon's terms as precluding a showing of the project in the United States and elsewhere, especially when the station was willing to invest $270,000. It is also unlikely that they took Wildmon's letter of October 29 to mean more than a restriction of unedited footage of Wildmon. Certainly they were careless in indicating their preliminary acceptance to Wildmon's letter and in releasing a letter from Willis expressing his assent. But at that point, the station and the producers were focused on one concern of Wildmon's, which was that he be presented *fairly*. He had told Yule—and Yule had told the station—that previous interviewers had expressed his ideas unfairly by using words out of context or by accusing him of censorship when, as a private citizen, he had a right to make his views known. Yule was willing to try to avoid these mistakes in his own production, so that he and the station probably believed in all honesty that it was the use of Wildmon's interview in *other* productions that Wildmon was concerned about. Somewhat more troubling is Yule's silence about the anticipated content of the film and the deferential treatment he showed the Tupelo minister in other ways. For example, he excused Wildmon from a producer-oriented release and couched each correspondence in soothing terms. Never-

has taken these arguments into consideration, the need for extrinsic evidence to help uncover the meaning of the agreement is clear.

**12.** *See* RESTATEMENT (Second) of CONTRACTS § 213 comment a (1981).

theless, the court does not find Yule's behavior to have been overreaching or calculated to deceive. After all, Wildmon was a seasoned interviewee who knew the advantages and pitfalls of the interview situation. Yule's agenda was no more hidden than that of any other interviewer eager to "get the story."

At this stage of the negotiations, Wildmon added the Mendenhall agreement to the picture. The major problem with the Mendenhall agreement is that it was written to protect Wildmon in a *print* interview situation. Presumably, Wildmon would have known the newspaper or publication for which Mendenhall wrote and was primarily concerned with avoiding the appearance of the interview elsewhere such as in *Playboy, Hustler* and *Penthouse.* But although Wildmon thought he knew the medium in which the British broadcasters worked and "trusted" them, he was not already familiar with their project in the same way that he would have been familiar with an American newspaper or magazine. In other words, he did not know that the final work, "Damned in the U.S.A.," would disturb his sensibilities as much as any *Playboy* Channel or *Hustler* magazine. With the benefit of hindsight, this court can say now that the attempt by Wildmon's lawyers to fit the Mendenhall print contract to the Yule–Stack film situation was not the best way to prevent the showing of his likeness in a film he might find offensive.[13] There was no attempt by Wildmon to limit, restrict, or control the publication or distribution of the Mendenhall interview in newspapers or magazines other than those sexually-oriented magazines specifically prohibited by the terms of the contract.

▇ Moving to the date of the agreement and interview, the court finds it significant that Wildmon stated, "you're going to take this interview back ... and you're going to do a film." To the court, this is evidence that he himself understood the difference between the interview and the film on the same two days in which his lawyers were offering up the contract for the producers' signatures. Of course, ambiguous terms are construed more strongly against the party drafting them. *Nicholas Acoustics v. H & M Construction Co.,* 695 F.2d 839, 843 (5th Cir.1983) (applying Mississippi law); *Baton Rouge Contracting Co., Inc. v. West Hatchie Drainage District of Tippah County,* 304 F.Supp. 580, 589 (1969), *aff'd,* 436 F.2d 976 (1971) (applying Mississippi law); *Stampley v. Gilbert,* 332 So.2d 61, 63 (Miss.1976); *Home Mutual Fire Insurance Co. v. Pittman,* 71 So. 739, 740, 111 Miss. 420 (Miss.1916). At the same time, this rule of construction should not be enlarged to perfunctorily resolve an ambiguous meaning; the trier of fact should still consider the drafting party's evidence. *Mississippi State Highway Commission v. Dixie Contractors, Inc.,* 375 So.2d 1202, 1205–06 (Miss.1979). Plaintiffs emphasize Yule's letter of April 17, forewarning Wildmon about the content of the film, and his correspondence with Sissons and Frances Berwick in which he refers to Wildmon's "permission." With the exception of the contract itself, the court has focused most of its attention on these documents. The undersigned concludes that when this correspondence is considered in context with all the other evidence, it does not show that the producers and the station acquiesced to Wildmon's interpretation.

First, it must be remembered that Yule was on very cordial terms with Wildmon when he wrote the April 17 letter. At the hearing, Yule stated that he had developed a respect for Wildmon which increased as he viewed and reviewed the footage during the making of the film. Second, it was Wildmon who first used the term "permis-

---

**13.** At the same time, a comparison of the Mendenhall agreement with the Yule–Stack agreement does not entirely cut against Wildmon. When Yule and Stack signed the agreement without the benefit of their lawyers, they failed to note that the phrase "any other media outlet," the term used in their December contract, was more broad than the term "sexually oriented magazine," which was used in the Mendenhall agreement. Overall, the court finds the Mendenhall contract to be only marginally helpful in discerning the intent of the December agreement and turns to the other evidence.

sion," not Yule. Yule did initiate the inquiry by asking Wildmon if he had any "objection" to the Spain and Sweden sales, but in the court's opinion, Yule was showing a courtesy to a respected interviewee rather than actually seeking permission. Later, Yule used the term "permission" freely, but this was at a time when he had no reason to think that Wildmon had any misgivings about the film. After all, Wildmon contended that he did not view the film in its entirety until June 24, approximately two months after he would have received it.[14] Yule had no reason to believe that he and the interviewee were not on good terms.

In the final analysis, the court must return to the words of the agreement and ask if Wildmon really ensured that the agreement protected his unique concerns. The rules in aid of interpretation are clear: the writing must be interpreted as a whole;[15] an interpretation which gives a reasonable meaning to all terms is preferred to an interpretation which does not;[16] and an interpretation that favors the public interest should be chosen over one that disfavors it.[17] Also, the court cannot ignore the well-known rule that ambiguous agreements are construed more strongly against the drafter. The most reasonable interpretation of this whole agreement is that the interview meant the interview alone and that Wildmon did not have control over the distribution of the entire film. The court finds that the drafters of the contract recognized and identified three separate entities or tangible objects in the contract document, to-wit: (1) the interview, (2) the television presentation, and (3) any other media presentation. The court finds that the drafters intended to limit the utilization of the lengthy interview for purposes or presentations other than the film. Even if Yule never told Wildmon that the primary subject and provisional title of the film was "Robert Mapplethorpe" and never told him that the film would contain graphic images, Wildmon knew or should have known that the film was to be a work about a debate. With gestures and his own terminology, he himself described the controversial images in his interview, suggesting that the images must be shown in order for the debate to be fully understood. Any objective person who views the film would believe that Wildmon is projected fairly and intelligently. Of course, for Wildmon, this is beside the point. But if Wildmon intended to make control over distribution of the entire film dependent upon his approval of its content, he should have drafted this intention much more clearly. As the person with the best understanding of his own concerns, Wildmon had the obligation of stating that the film could only be shown one time to a British audience unless he permitted showings elsewhere.

■ Finally, the public interest favors a narrow reading of the terms of this contract. Despite attempts by both parties to inject public policy and first amendment arguments into the case, the court has tried to keep the case primarily in the realm of contract law. In *Cohen v. Cowles Media Co.*, 501 U.S. ——, —— – ——, 111 S.Ct. 2513, 2518–19, 115 L.Ed.2d 586, 596–97 (1991), the Supreme Court made clear that a state's theories on promissory estoppel do not offend the first amendment simply because they have an incidental effect on a publisher's ability to gather and report information. Specifically, the first amendment did not prohibit a plaintiff from recovering damages under such a theory for a newspaper's breach of a promise of confidentiality. When considered in conjunction with the instant case, *Cohen* suggests that Wildmon's rights under his contract are not diminished simply because the defendants are producers and distributors or because

---

**14.** The court finds this to be additional evidence that Wildmon differentiated between the film and the interview. If Wildmon believed that the contract gave him control over the distribution of the film, one would think that he would have viewed the entire film immediately to see whether he would want to exercise the contract option.

**15.** RESTATEMENT (Second) of CONTRACTS § 202(2) (1981).

**16.** RESTATEMENT (Second) of CONTRACTS § 203(a) (1981).

**17.** RESTATEMENT (Second) of CONTRACTS § 207 (1981).

they made a film to be shown to the public. Wildmon relies on the *Cohen* case for precisely this proposition. At the same time, *Cohen* does not relieve a drafter of the responsibility of making the contract clear. In *Cohen,* no ambiguity existed in the promise between the interviewee and reporters who assured that the interviewee's name would be confidential. In the instant case, the contract terms were so unclear that the parties devoted two days of argument to its meaning. The court is of the opinion that unless the contracting parties have clearly promised to limit the flow of information as they did with the confidentiality agreement in *Cohen,* an ambiguous contract should be read in a way that allows viewership and encourages debate. This is no more than following the basic rule of interpretation found in the Restatement which favors a reading in the public interest.

## CONCLUSION

For all the above reasons, the court will order that declaratory judgment be granted in favor of the defendants. This determination necessarily disposes of plaintiffs' claims for breach of contract and tortious breach of contract. Accordingly, plaintiffs' motion for summary judgment will be denied and the primary claim will be dismissed. However, because the release of the film will have irreversible effect, the court invites the plaintiffs to immediately move for a stay pending appeal pursuant to Fed.R.Civ.P. 62(c)[18] and *United States v. Baylor Universal Medical Center,* 711 F.2d 38, 39 (5th Cir.1983).[19] Naturally, this has been a very difficult and hard-fought case. To expedite matters and discourage lengthy, unnecessary briefing, the undersigned forewarns the defendants that should plaintiffs forward such a motion, the court will give it very serious consideration because 1) plaintiffs have presented a

"substantial case on the merits" and the other concerns of *Baylor* appear to be met, and 2) the status quo will completely change if full distribution of the film is allowed prior to any decision on appeal.[20]

Finally, defendants' request for attorneys' fees will be denied. Where jurisdiction is based on diversity of citizenship, attorneys' fees may be recovered in a declaratory judgment action in the discretion of the district court if recovery would be in accord with state law. *Iowa Mutual Insurance Co. v. Davis,* 689 F.Supp. 1028 (D.Mont.1988). Mississippi follows the "American rule" on attorney's fees which ordinarily disallows fees to the successful litigant. *See Grisham v. Hinton,* 490 So.2d 1201, 1205 (Miss.1986). Especially in this case, where plaintiffs proceeded in good faith and much of the confusion is attributable to defendants' careless correspondence, the award of attorney's fees is inappropriate.

A separate order and judgment in accordance with this memorandum opinion will be issued this day.

---

**18.** Rule 62(c), which works in conjunction with Fed.R.App.P. 8(a), allows a district court to grant an injunction "during the pendency of the appeal upon such terms ... as it considers proper ..."

**19.** *Affirmed, modified and vacated in part on other grounds,* 736 F.2d 1039 (5th Cir.1984).

**20.** Although a serious legal question is ordinarily needed to justify a stay, the undersigned is of the opinion that the equities strongly favor a stay in this unusual case because full release of the film to audiences in the United States will have an irreversible effect.