**COUNTY OF ORANGE, Plaintiff,**

**v.**

**McGRAW HILL COMPANIES, INC., Defendant.**

**No. SA CV 96–765–GLT EEX.**

United States District Court, C.D. California, Santa Ana Division.

March 18, 1999.

See also 245 B.R. 138.

J. Michael Hennigan, James W. Mercer, Hennigan, Mercer & Bennett, Los Angeles, CA, for Plaintiff.

Eve M. Coddon, Geoffrey L. Thomas, Paul, Hastings, Janofsky & Walker, Los Angeles, CA, Brian A. Sun, Frederick D. Friedman, Ellyn S. Garofalo, O'Neill, Lysaght & Sun, Santa Monica, CA, Donald L. Morrow, Steven Dale Allison, Paul, Hastings, Janofsky & Walker, Costa Mesa, CA, for Defendant.

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

TAYLOR, District Judge.

The Court GRANTS Defendant's Motion for Summary Judgment on Plaintiff's breach of contract and professional negligence claims concerning the County's 1993 debt issues. The Court DENIES Defendant's Motion for Summary Judgment on Plaintiff's breach of contract and professional negligence claims concerning the County's 1994 debt issues.

### I. Background

The County alleges S & P was retained in 1993 and 1994 to provide bond rating and investment services to the County. The County and S & P entered into separate agreements for each of the debt offerings the County made between 1993 and 1994. These agreements were called "Memorandum of Agreement[s]—re Municipal Debt Contract Ratings" (MOA's).

The County maintains S & P breached the MOA's by providing rating analyses

**154**

which wrongly stated that the County's financial condition and ability to repay the debt were fundamentally sound. The County states it would not have (nor would it have been able to) market the 1993 and 1994 debt securities without the ratings S & P provided.

In addition, the County contends S & P negligently performed its rating services, giving rise to tort liability. The County maintains S & P knew, or recklessly disregarded, facts showing the County's bond offerings were unsound.

If S & P had complied with its contractual and professional duties, the County argues, it would have known:

1. County Treasurer Robert Citron and his assistant Matthew Raabe misrepresented the safety of the County's investment portfolio;
2. The County's equity and liquidity were at extreme risk from rising interest rates;
3. Citron and Raabe's plan in 1994 to expand the scope of the interest rate bet to which they intended to commit the County and the Pool threatened major additional losses; and
4. Relying on the County's assets, particularly its investment portfolio, as a source of repayment at bond maturity was extremely risky and imprudent.

If S & P had revealed any significant portion of the material facts and risks of which it was aware, the County claims, the County would have terminated the offerings, stopped purchase of long-term securities, and restructured the Pool. Thereby, it alleges, the County could have avoided its heavy losses.

II. *The Actual Malice Standard Applies to the County's Breach of Contract Claim*

A. *The Breach of Contract Claim*

The County contends it contracted solely for a rating, and S & P breached that contract by inadequately performing the analytical services underlying the ratings. Although it does not presently claim there was a separate contract for analytical services, the County contends S & P assumed a duty to adequately perform the services called for in the contract. The County argues this duty to perform contractual services "in a competent and reasonable manner" is inherent in all California contracts. *See, e.g., Michaelis v. Benavides,* 61 Cal.App.4th 681, 687, 71 Cal.Rptr.2d 776 (1998).

■ S & P contends it is protected under the "actual malice" standard set out in *New York Times v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). The United States Supreme Court has held publishers are not automatically entitled to First Amendment protection. *See First Nat. Bank of Boston v. Bellotti,* 435 U.S. 765, 802, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978)(Burger, C.J., concurring)("Because the First Amendment was meant to guarantee freedom to express and communicate ideas...[it] does not 'belong' to any definable category of persons or entities: It belongs to all who exercise its freedoms"). Thus S & P's status as a financial publisher does not necessarily entitle it to heightened protection under the First Amendment.

■ Publishers are subject to nondiscriminatory, neutral laws which do not affect the impartial distribution of news. *See, e.g., Cohen v. Cowles Media Co.,* 501 U.S. 663, 670, 111 S.Ct. 2513, 115 L.Ed.2d 586 (1991)(holding the "publisher of a newspaper has no special immunity from the application of general laws. He has no special privilege to invade the rights and liberties of others."). As this Court stated in its March 18, 1997 Order, "[t]he question is not whether the defendant is a publisher but whether the cause of action impacts expression." Order of March 18, 1997, at 8.

■ To accommodate the "breathing-space" the First Amendment requires, a

publisher will not incur liability for a false statement unless the statement was made with "actual malice," *i.e.,* "with knowledge that the statement was false or with reckless disregard for whether or not it was true." *Hustler Magazine v. Falwell,* 485 U.S. 46, 56, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988). The "actual malice"[1] standard applies to false statements about public figures (*Hustler Magazine,* 485 U.S. at 46, 108 S.Ct. 876), and matters of public concern (*New York Times v. Sullivan,* 376 U.S. 254, 280, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)).[2]

■ Although these issues traditionally arise in libel or defamation actions, the actual malice standard applies to other causes of action when the plaintiff seeks compensatory damages arising from allegedly false statements. *See Hustler Magazine,* 485 U.S. 46, 108 S.Ct. 876 (intentional infliction of emotional distress); *Blatty v. New York Times Co.,* 42 Cal.3d 1033, 232 Cal.Rptr. 542, 728 P.2d 1177 (intentional interference with prospective economic advantage); *Bose v. Consumers Union,* 466 U.S. 485, 493–514, 104 S.Ct. 1949 (1984)(product disparagement action); *Time, Inc. v. Hill,* 385 U.S. 374, 387–88, 87 S.Ct. 534 (1967)(invasion of privacy).

■ The County's debt offerings presented matters of public concern. The County contends S & P's actions caused them to incur $500 million in debt and contributed to the largest municipal bankruptcy in history. S & P and the County agreed either could publicize the rating. *Compare Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.,* 472 U.S. 749, 761–62, 105 S.Ct. 2939 (1985)(individual's credit report was not a matter of public concern because it was speech solely in the individual interest of the speaker and its specific business audience and was made available to only five subscribers who could not disseminate it further).

Based on these factors, S & P urges the application of the actual malice standard to the County's claim for breach of contract to provide ratings. In its March 18, 1997 Order, the Court stated that, absent special circumstances, S & P's ratings of the debt securities might be protected by the actual malice standard. The Court further stated in that Order that the County's breach of contract claim was not necessarily precluded because S & P had the right and ability to contract away its First Amendment protection. The Court noted "[c]ourts are reluctant, however, to find a promise to limit First Amendment protection if it is not clearly part of the contract," citing *Wildmon v. Berwick Universal Pictures,* 803 F.Supp. 1167, 1178 (N.D.Miss. 1992). The Court held that, since the MOAs could possibly be construed to indicate S & P promised to provide an accurate rating, i.e., that it waived its First Amendment protection, the County's breach of contract claim survived S & P's then-pending motion to dismiss.[3]

1. The "actual malice" standard supplies the "breathing-space" the First Amendment requires. Under this standard, a publisher will not incur liability for a false statement of fact unless the statement is made with "actual malice," i.e., "with knowledge that the statement was false or with reckless disregard for whether or not it was true." *Hustler Magazine v. Falwell,* 485 U.S. 46, 56, 108 S.Ct. 876 (1988).

2. In *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), the Court modified its application of the *Sullivan* standard to matters of public concern. *Gertz* found a stronger state interest in compensating private figures for harm to their reputation inflicted by false statements than in protecting public figures from such harm even when the false statement involved a matter of public concern. 418 U.S. at 348–49, 94 S.Ct. 2997. However, *Gertz* requires private-figure libel plaintiffs seeking presumed and punitive damages to demonstrate actual malice if the libelous statements involved a matter of public concern.

3. In its March 16, 1998 Order, the Court ruled that, to the extent S & P was entitled to protection under the First Amendment, this protection was not absolute, but was under the actual malice standard.

## B. *Present Motion*

The actual malice standard will apply to the County's breach of contract claim absent "special circumstances," i.e., unless the Court finds S & P voluntarily waived its First Amendment protection. The County contends this case falls under the *Cohen* standard, because the County is suing for breach of contract, which is a law of general applicability and does not single out publishers.

S & P claims it did not assume a duty to render an accurate rating. Rather, S & P states the only service it contracted to provide was the rating for potential publications, which is protected expression, so the County's contract claim is subject to the actual malice standard.

The County states the duty to perform contractual services "in a competent and reasonable manner" spelled out in *Michaelis, supra*, constitutes a special circumstance taking the contract claim out of the range of actual malice protection.[4]

A waiver of a constitutional right "is not to be implied and is not lightly to be found." *Gete v. Immigration and Naturalization Svc.*, 121 F.3d 1285, 1293 (9th Cir.1997). Waiver must be "voluntary, knowing, and intelligent." *Marilyn Manson, Inc. v. New Jersey Sports & Exposition Auth.*, 971 F.Supp. 875, 889 (D.N.J.1997). "[U]nless the parties have clearly promised to limit the flow of information as they did with the confidentiality agreement in *Cohen*, an ambiguous contract should be read in a way that allows viewership and encourages debate." *Wildmon v. Berwick Universal Pictures*, 803 F.Supp. 1167, 1178 (N.D.Miss.1992). The MOA contains no express waiver of constitutional rights. The County, not contending there was an express contract

for separate financial services, now wishes to impose upon S & P an implicit duty to perform its services in a competent manner, a duty which it claims is inherent in all California contracts. *See, e.g., Michaelis, supra.*

In *Cohen v. Cowles Media Co.*, 501 U.S. 663, 670, 111 S.Ct. 2513 (1991), upon which the County relies, the United States Supreme Court held the First Amendment did not bar a promissory estoppel claim because promissory estoppel was a claim of general application which did not burden publishers in particular. The key to the Court's holding, however, was that the newspapers had expressly promised the plaintiff they would not reveal his name, thus undertaking a separate duty to plaintiff. Here, there has been no express promise made to the County separate from the contract for a rating.

Having disclaimed a separate undertaking to provide financial services, which might have avoided the actual malice standard as a "special circumstance," the County cannot avoid the First Amendment by asserting an implied contractual duty to perform the rating function competently that would fall outside the First Amendment. The actual malice standard applies to the County's claim for breach of contract.

Since there is no claim or showing S & P undertook a separate duty to provide a competent rating, the only element of the County's breach of contract claim is the providing of the rating itself. Any duty to perform competently would be part of the Constitutionally—protected rendering of a rating, not a separate obligation. A claim that S & P breached its duty to provide a rating in a competent manner is subject to the actual malice standard.[5]

---

4. "The Court has ruled that Standard & Poor's ratings are speech and, absent special circumstances, are protected by the First Amendment. In reaching this ruling, the Court assumed any First Amendment protected speech, as a matter of public concern, would receive the heightened protection of

the actual malice standard." Order of March 16, 1998, at 5.

5. At oral argument, the County made clear its disclaimer of any assertion of a *separate* undertaking for analytical services, but contended it bought only a rating which *included*

III. *The County's Professional Negligence Claim*

A. *The Actual Malice Standard Applies*

The County alleges the actual malice standard should not apply to its claim for professional negligence. The Court has ruled on multiple occasions that the actual malice standard applies to any professional negligence claim concerning S & P's protected speech. In its June 2, 1997 Order, the Court stated: "Because the County alleges harm arising from S & P's expressive activity, the Court finds the tort cause of action does not arise from non-publishing activity, and the County must therefore satisfy the heightened pleading standards of the First Amendment." Order of June 2, 1997, at 10.

 After the Court issued its June 2, 1997 Order, the County alleged it had contracted with S & P for analytical services separate from the ratings S & P would provide. In its March 16, 1998 Order, the Court acknowledged the First Amendment might not apply to claims the County brought regarding separate analytical services. Order of March 16, 1998, at 7. Now, the County says it contracted solely for a rating. This Court has previously held the First Amendment protects S & P's preparation and publication of its ratings. *See, e.g.,* Order of June 2, 1997, at 7 (citing *Shoen v. Shoen,* 48 F.3d 412, 416 (9th Cir.1995)(holding First Amendment protects not only published information, but also journalist's out-takes, notes and other unused information)); *see also* Order of June 2, 1997, at 8 ("The County may not avoid the First Amendment and the actual malice standard simply by basing its cause of action on the preparation, rather than the publication, of the ratings."). Thus the actual malice standard applies to the County's professional negligence claim.

analytical services. The Court declines to treat this as a "special circumstance" undertaking that would avoid the First Amendment.

B. *Summary Judgment Standard*

Summary judgment is proper if "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the initial burden of proving the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If the moving party makes this showing, the burden then shifts to the non-moving party to "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324, 106 S.Ct. 2505.

In making this determination, "the inferences to be drawn from the underlying facts contained in [evidentiary] materials must be viewed in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993 (1962). If the non-moving party fails, "the moving party is entitled to a judgment as a matter of law." *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548.

In a case governed by the actual malice standard, there must be a triable issue that the jury can find the required proof by that high standard. *Anderson,* 477 U.S. 242, 255-56, 106 S.Ct. 2505 (1986)("Thus where the factual dispute concerns actual malice, ... the appropriate summary judgment question will be whether the evidence in the record could support a reasonable jury finding either that the plaintiff has shown actual malice by clear and convincing evidence or that the plaintiff has not.").

C. *Merits*

(1) *Separate Duty Requirement*

The Ninth Circuit defines the elements of a professional negligence cause of action as follows:

> It is, rather, a *usual* circumstance of preparing a rating.

In order to establish a claim for professional negligence, a plaintiff must demonstrate:

1) the duty of the professional to use such skill, prudence and diligence as other members of his profession commonly possess and exercise; 2) a breach of that duty; 3) a proximate causal connection between the negligent conduct and the resulting injury; and 4) actual loss or damage resulting from the professional's negligence.

*In re Daisy Sys. Corp.*, 97 F.3d 1171, 1175 (9th Cir.1996) (citing *Jackson v. Johnson*, 5 Cal.App.4th 1350, 1355, 7 Cal.Rptr.2d 482 (1992)).

In its December 5, 1996 Order, the bankruptcy court held the privity of contract between the County and S & P was sufficient to constitute the requisite duty for a professional negligence claim. In its March 18, 1997 Order, the Court reversed this holding, stating the California Supreme Court has required a duty independent of the contract in order for a tort claim to arise from a breach of contract. The Court further stated "[t]his does not end the inquiry, however. S & P's position in the securities field may have caused it to assume an independent professional duty enforceable in a tort action."

The Court did not rule at that time whether or not S & P, as a ratings provider, owed a tort duty separate from any contractual duty. The Court does not reach this question on the present motion, however, because S & P moves for summary judgment on a different ground: "In the present motion, however, Standard & Poor's does not seek judgment on the County's tort claim on the theory that the County is limited solely to a contract cause of action. Rather, this motion addresses the standard of care which should be applied to a speech-related claim."[6] S & P's Reply at 23.

*(2) Definition of Actual Malice*

Actual malice is a subjective standard: "If a false and defamatory statement is published with knowledge of falsity or a reckless disregard for the truth, the public figure may prevail." *Harte–Hanks Communications v. Connaughton*, 491 U.S. 657, 688, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989). "A 'reckless disregard' for the truth, however, requires more than a departure from reasonably prudent conduct. There must be sufficient evidence to permit the conclusion that the defendant actually had a high degree of awareness of … probable falsity.'" *Id.* (quoting *St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968)). Failure to investigate before publishing, even when a reasonably prudent person would have done so, does not establish reckless disregard. *Harte–Hanks*, 491 U.S. at 688, 109 S.Ct. 2678.

*(3) The County's 1993 and 1994 Debt Offerings*

For the purposes of ruling on S & P's summary judgment motion, the Court will treat the breach of contract claim and the professional negligence claim together, since both claims stem from the provision of the same ratings and allege breach of S & P's duty to provide those ratings. Both claims are subject to the actual malice standard.

The County states S & P assigned ratings of "SP–1" or "A–1+" (its highest possible rating) to all of the short-term debt issued by the County in 1993 and 1994. The County alleges "[t]hese ratings indicated that S & P had concluded based upon its comprehensive 'quantitative, qualitative and legal analyses' that these issues possessed 'overwhelming safety characteristics.' The ratings, however, were inconsistent with facts S & P knew at the time." Beall Decl. in Support of Plaintiff's Opp. at Exh. H, I (quoting MOAs and S &

---

**6.** Since S & P does not move for summary judgment on the question of whether a separate tort duty is required, the Court will reserve judgment on this issue. Should a future motion be brought on this issue, the Court will address it at that time.

P's Commercial Paper Rating Definitions). The County further alleges S & P knew "uncontrollable market forces presented significant danger to [the] repayment of the bonds."

The County contends S & P learned, during its analysis of the County's proposed 1993 and 1994 offerings, that County Treasurer Robert Citron was "engaged in a harrowing investment strategy, using massive amounts of leverage and exotic derivative securities to bet the public funds under his control on inherently unpredictable interest rates." The County states S & P was, by its own admission, uncomfortable with the Treasurer's investment strategy. *See* Swerdling Depo., Exh. 15 to Saunders Decl., at 171 (witness states he "may not have been" totally comfortable with the Orange County Treasurer's investment portfolio).

The County points out S & P's chief economist was predicting in March 1994 that interest rates would rise, thus the County contends S & P knew the County's investment strategy, which depended heavily on interest rates remaining low, was in trouble. *See* Saunders Decl. Exh. 37 (S & P's *Creditweek* publication from March 21, 1994, at 107, stating "However, the low-rate environment that created these opportunities [for municipal issuers] is beginning to change."); *see also* Exh. 42–45 (S & P analysts' handwritten notes of May 9, 1994 conference call with Orange County officials, including Jean Costanza "a remark that a rise of 300 basis points could mean 'disaster' ").

The County contends that, if S & P had given speculative instead of investment-grade ratings to the County's issues, Citron would not have been able to continue borrowing funds necessary to keep his investment plan afloat. Accordingly, the

County states S & P played a "pivotal role" in the financing of Citron's scheme.

(a) *The County's Allegations of S & P's Involvement in 1993 Debt Financings*

The County states "[i]n 1993, after reviewing the Treasurer's investment policy, S & P analysts concluded that they could 'not be totally comfortable with' Citron's investment strategy." Saunders Decl. Exh. 26 (S & P Rating Analysis of City of Anaheim's 1993 Offering of $60 million 1993 Taxable Notes)("Although proceeds may be invested in instruments that S & P might not be totally comfortable with, S & P is still looking to the City G.O. rating (AA-) and general fund pledges to make up any investment losses."). Citing the deposition of Robert Swerdling of S & P, the County states S & P's analysts understood increases in interest rates could result in investment losses for the County. Saunders Decl., Exh. 15, pp. 367–70.

(b) *1994 Debt Financings*

The County presents evidence, in the form of depositions and declarations, that S & P was aware Mr. Citron's investment practices became increasingly risky in 1994. The County states S & P representatives met with County officials in New York and learned, among other things, that Citron's strategy was oriented more toward yield level than toward safety; the County had attracted wide pool participation through an aggressive strategy dependent upon flat or declining interest rates; and rates were going up and paper losses were beginning to mount. Opp. to Motion on Punitives at 8 (citing Saunders Decl. at Exh. 17, 34–36).[7] The County alleges S & P, realizing the County could

---

7. The County states "[d]espite this discussion and the prediction by S & P's chief economist of a sustained rise in interest rates, S & P analysts do not recall taking any steps to determine the magnitude of the losses in the portfolio or the composition of the investments in the portfolio." Opp. re. Punitives

at 8. This is not enough, standing alone, to establish actual malice: "Failure to investigate before publishing, even when a reasonably prudent person would have done so, does not establish reckless disregard." *Harte–Hanks,* 491 U.S. at 688, 109 S.Ct. 2678.

only survive rising interest rates by maintaining adequate liquidity in the pools, actively discouraged Pool Participants from removing their funds from the Pool. *See, e.g.,* Saunders Decl. Exh. 13. S & P analyst Diane Broson also gave favorable and reassuring comments to the press about Citron and the County's financial status, which the County contends was part of an effort on S & P's part to maintain public calm regarding the Pool's stability. *See* Saunders Decl. Exh. 47 (Broson stating to *Los Angeles Times* "she had been in close touch with Orange County officials during the past few weeks, adding that the county's credit rating remains 'very high and very strong' with [S & P].").[8]

The County submits handwritten notes taken by S & P personnel during a May 9, 1994 conference call regarding Orange County. These notes show S & P analysts were aware that collateral calls on the Pool were rising; paper losses were approximately $1 billion; disclosure of market losses could lead to a run on the Pool; and "disaster" could result from an increase in interest rates beyond 2%. Saunders Decl. Exh. 4, 8, 42–45, 58. The County infers from these notes, and lack of a later reduction in the County's investment grade, that S & P was trying to cover up what it knew. S & P's motive, the County alleges, was to avoid a run on the pool which would result in defaults on debt S & P had previously rated as investment grade. The County alleges S & P issued false ratings knowing "the County's ability to repay the existing and proposed offerings was far from 'strong or very strong' and that the offerings did not bear 'overwhelming safety characteristics.'"

### (c) *Genuine Issues of Material Fact on the 1994 Debt Issues, but not the 1993 Issues*

█ Drawing all permissible inferences in favor of the County, a reasonable jury could not conclude by the necessary standard that S & P knew of a high degree of probable falsity when it rated the County's 1993 debt. Although the County shows S & P was "not totally comfortable" upon review of the County's investment portfolio in 1993, and understood that a rise in interest rates could seriously compromise the County's financial position, a reasonable jury could not conclude S & P acted with reckless disregard for the truth at that time.

While a reasonably prudent rating agency might have been more cautious in assigning top ratings to the County's 1993 debt, the evidence shows the County's track record for repaying its debt had been good to that point. Citron's strategy, however reckless in hindsight, was earning high yields. S & P states its ratings represent its "opinion as of the date of publication concerning the issuer's creditworthiness with respect to a specific obligation." Interest rates had not yet risen to the point where assigning a top rating, even given what S & P allegedly knew at that time, rose to the level of "high degree of awareness of ... probable falsity" or "reckless disregard for the truth." The County cannot meet the "reckless disregard" standard on the 1993 debt ratings.

█ The County has, however, raised genuine questions of material fact on S & P's assignment of ratings to the County's 1994 debt. The County has shown that by 1994 S & P was aware of Citron's strategy and the potential "disaster" which could

---

**8.** S & P contends Broson's statements to the press concerning Citron cannot be used by the County to help create a triable issue of fact. S & P cites *Dodds v. American Broadcasting Co.,* 145 F.3d 1053 (9th Cir.1998), for the proposition that "Statements of opinion concerning whether a person who holds a public office is fit for that office are fully protected under the First Amendment, wheth-

er or not those statements are supportable, verifiable or based on facts or premises that are disclosed." S & P's Summary Judgment Mem. at 38. It is not claimed, however, that the Broson statement is actionable. It is offered as evidence what S & P was doing, and the First Amendment does not prevent such evidentiary use.

result if interest rates continued to rise. Handwritten notes from S & P personnel show these people were aware interest rates had risen 2% in the previous 100 days and this represented a clear and present danger to the liquidity of the Pool. *See* Saunders Decl. at Exh. 42–44.

S & P's public comments assuring the public of its belief in Citron's strategy support the County's inference of a cover-up to protect S & P's reputation. The evidence of S & P's encouraging Pool Participants to keep their money in the Pool supports this inference as well.

The County has raised a genuine question of fact about whether S & P acted in reckless disregard of truths of which it was aware when it assigned ratings indicating to the public that the County's 1994 debt possessed "overwhelming safety characteristics." The County also raises a triable issue about whether S & P knowingly issued false ratings in order to protect itself from the repercussions of downgrading issues to which it had previously given top ratings. Finally, the County has raised a triable issue about whether S & P had "obvious reasons to doubt the veracity of its reporting, [but] engaged in purposeful avoidance of the truth." *Eastwood v. Nat'l Enquirer, Inc.,* 123 F.3d 1249, 1257 (9th Cir.1997).

S & P contends the County's suit is an "unprecedented assault on speech by the source of the very information complained of." S & P states the County's action is "extraordinary" because the Securities and Exchange Commission "specifically found the County made affirmative misrepresentations to rating agencies, including [S & P]." S & P also states Citron pleaded guilty to "public deception" and Raabe was "convicted of felonies." These facts, if admissible, can be taken into account by a jury in weighing the evidence, but they do not preclude the existence of a genuine issue of material fact. There is sufficient evidence S & P knew of factors, of which the County was not the source, which

could have alerted S & P to the dangers of the County's investment practices.

S & P states the County's claims should be precluded because the County was ultimately able to repay its obligations. This argument is not persuasive given the lengths (suspension of services, extended repayment periods, etc.) to which the County had to go to ensure this repayment.

S & P also states it never actually rated the County's investment Pool. Regardless of whether S & P actually rated the Pool, the County can still bring claims based upon S & P's subjective knowledge of threats to the Pool's liquidity.

S & P asserts the County's claims should fail because the County "never complained to Standard & Poor's that the ratings were too high or false. Indeed, the County never appealed the ratings (as was its right). Rather, the County publicly embraced the ratings by repeatedly publishing them in official statements." That a municipal issuer failed to appeal is not grounds for granting summary judgment when the claim is the rating was falsely given.

S & P asserts it could not have known its ratings were false because Moody's also gave the County a high rating. This does not support a conclusion that, as a matter of law, S & P's ratings were not falsely given.

Finally, S & P again attempts to persuade the Court its ratings are opinions which are not provably false. The Court has rejected this argument in the past and does again today. *See* Order of March 18, 1997 at 21 fn. 7; Order of June 2, 1997 at 13.

## IV. *Disposition*

The Court GRANTS Defendant's Motion for Summary Judgment on Plaintiff's breach of contract and professional negligence claims concerning the County's 1993 debt issues. The Court DENIES Defendant's Motion for Summary Judgment on

Plaintiff's breach of contract and professional negligence claims concerning the County's 1994 debt issues.